KIRBY AISNER & CURLEY LLP
*Proposed Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
Tel: (914) 401-9500
Erica R. Aisner, Esq.
eaisner@kacllp.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:

LAWRENCE A. FIRST,

                   Debtor.
---------------------------------------------------------X

Chapter 11

Case No. 22-11020 (MG)

## DECLARATION OF LAWRENCE A. FIRST
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

LAWRENCE A. FIRST hereby declares, pursuant to 28 U.S.C. §1746 as follows:

1.     I am the individual chapter 11 debtor herein (the "Debtor").  I submit this declaration pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

**Local Rule 1007-2(a)(1)**

*Personal Background:*

2.     I am an attorney and practiced law at Fried, Frank, Harris Shriver & Jacobson LLP until 2002 when I transitioned into the investment world as an investment manager specializing in distressed markets. I am 60 years old, married, and have four adult children. In the fall of 2016, I was diagnosed with Parkinson's disease, which I have been able to successfully manage to date through the implementation of a very aggressive daily physical activity protocol and medications.

3.      My family and I resided in Scarsdale, New York for over twenty-five years which is where my wife and I raised our family. In 2014 my wife and I purchased a pied-à-terre in the upper west side of New York City which we intended for convenience, business, and personal use. This apartment required a gut renovation which took two years to complete. Just as the work was finished and my wife and I were ready to enjoy the fruits of our labor, I received my Parkinson's diagnosis. The original plan for me to go back and forth between Westchester and New York City was no longer advisable and my wife and I made the decision to sell the pied-à-terre and move to New York City full time. This would eliminate my commute to work, give me easier access to my doctors and therapists and give us the needed space for our children three of whom, at the time, were still full-time students.

4.      On May 10, 2017, my wife and I purchased a historic townhouse on West 85th Street in New York City (the "Townhouse"). We knew that this property would require significant rehabilitation, but it was a project we felt confident at the time that we could take on both financially and practically.

5.      For nearly two years, from May 10, 2017, until January 28, 2019 when my wife and I sold our pied-à-terre, we carried the expenses for three homes – this included, among other costs, nearly $40,000 in monthly mortgage obligations and over $200,000 in yearly real estate tax obligations.  This was in addition to the thousands of dollars every month I was expending on various professionals to assist with my physical protocols to manage my Parkinson's.  On May 15, 2020, my wife and I closed on the sale of our Scarsdale property, which was already in contract prior to the start of the pandemic and therefore did not realize the value that it otherwise would have had we waited a few short months to enter the market.

6.     By the time my wife and I had finally sold the Scarsdale house and pied-à-terre in New York City, we found ourselves without any meaningful liquidity. The construction on the Townhouse was two and one-half times over-budget due to unforeseen structural problems, and our financial accounts (other than the value of my interests in the various funds) had gone from approximately $16 million in 2017 to approximately $1 million in 2020 due largely to the investment in the Townhouse. My wife and I moved into the Townhouse in May of 2020, but we were painfully aware that we could not afford to remain in the home as we had dreamed. By February of 2021 we had listed the Townhouse on the market for sale. Although my wife and I thought we had secured a buyer in July of 2021, the deal fell through, and it was not until late November of 2021 that we were in contract. My wife and I eventually closed in late January of 2022. Following the sale, my wife and I rented a home in Connecticut and our son, who had been living with us in the Townhouse until that time, secured a two-bedroom apartment in New York City for which we pay two-thirds of the rent. The idea was that a move to Connecticut would be more affordable than maintaining full-time residency in New York City. However, the new apartment in the City would enable me to continue to reside there part-time to work and to have easy access to my doctors and therapists which are critical as my condition continues to progress.

*Professional Background:*

7.     Beginning in July of 2008, I left Merrill Lynch where I had worked for 6 years and took a position with American Securities LLC ("American Securities"), Ascribe Capital LLC ("Ascribe") and American Securities Opportunities Advisors LLC ("ASOA") (American Securities, Ascribe and ASOA are collectively, the "Companies"); three affiliated investment companies which managed over $1 billion in invested assets, principally through their management of multiple investment funds. Ascribe and ASOA served as the investment advisors

for the various funds and American Securities managed and controlled both Ascribe and ASOA. The principal behind the Companies responsible for overall management and control was Michael G. Fisch ("Fisch").  My responsibilities, pursuant to a written Employment Agreement, included, among other things, the management of at least four investment funds.

8.     For many years the funds I managed proved successful and I enjoyed a substantial income as a result. Unfortunately, there was a significant downturn in the markets in which the funds were heavily invested, including the energy markets which were hit very hard during the pandemic. This downturn triggered claw-backs and because of my personal financial situation brought about, in part, by the acquisition and construction on the Townhouse, I found myself without the capital necessary to satisfy a capital call due to one of the funds I managed.

9.     Fisch was aware of the events in my personal and financial life – the buying and selling of homes, my diagnosis and aggressive and expensive treatment protocols and the liquidity issues I was facing as a result. Although I was able to fund a claw back in 2018 for "Fund II" in the approximate amount of $4 million, I had many discussions with Fisch regarding my inability to fund any capital calls that may be needed in the near future.  He assured me that it would not be a problem and that they would be covered.

10.     Meanwhile, despite my personal issues and the downturn in the markets, the Companies were still able to raise a new fund (Fund IV) based upon our past performance records, so I had every reason to believe that my current financial problems would resolve as the Companies moved forward.

11.     When a second capital call was made for Fund II which I was unable to fund, I reached out to Fisch to secure an advance to cover the capital call which we had spoken about numerous times in the past. On or about June 2019, I entered into a promissory note (the "2019

Note") with ASCP, LLC (together with the Companies, Fisch and their affiliates, the "Creditor"), an entity affiliated with the Companies and owned by Fisch, pursuant to which I promised to repay approximately $6 million plus interest. As of June, 2021, which was the maturity date on the 2019 Note, I had successfully paid down the loan obligation to approximately $4.7 million.

12.     In or around the same time, unbeknownst to me and in violation of my employment agreement, Fisch had secretly entered into an agreement to merge Ascribe with Birch Grove, a larger asset management firm. I was notified of the merger after the fact, in June of 2021, which was followed by a detailed and lengthy negotiated separation agreement (the "Separation Agreement"). Under my employment agreement I would have been entitled to significant monetary payments due to the termination of my employment without cause. The Separation Agreement contemplated my continued cooperation, support and aid of the merger and related transitions, which was critical to the success of the merger. The Separation Agreement provided for, among other key terms, the settlement of the 2019 Note and other claw-back obligations, reduction of my income and other forms of compensation, go-forward title, responsibilities and monetary obligations and relinquishment of my financial holdings in the various funds and waiver of monies that would otherwise have been due me upon termination.

13.     Over the coming weeks, both Fisch and I performed under the terms of the Separation Agreement while the lawyers finalized the drafts. On July 1, 2021, the merger closed.

14.     On September 23, 2021, and again on November 9, 2021, Ascribe issued capital calls to all members of one of its funds (commonly referred to as Fund IV), including me, notwithstanding the fact that the Separation Agreement provided for the relinquishment of my interests in that fund.

15.     The negotiated terms of the Separation Agreement included the resolution of the 2019 Note obligation, which I was going to satisfy from the proceeds of the sale of the Townhouse.  Fisch was completely aware of my marketing the Townhouse and that I needed the proceeds in order to satisfy my 2019 Note obligations pursuant to the Settlement Agreement. Despite all of this, on November 4, 2021, ASCP, LLC filed an action in New York State Supreme Court to collect on the 2019 Note. To be clear, this action was filed against me, without any notice, while I was still an employee of the Companies and acting on their behalf as a director on the board of four portfolio companies as contemplated and required by the terms of the Separation Agreement.

16.     On November 19, 2021, I was held in default for failing to make the capital calls for Fund IV and eleven days later I received notice from American Securities that my employment was terminated.

17.     By a Decision and Order dated March 4, 2022, ASCP LLC was awarded a judgment on the 2019 Note. Notwithstanding the finding of liability by the Court, the Court did also rule that "[t]o the extent that defendant [First] has any claims against plaintiff or its related entities regarding his employment or other claims based on other agreements he is of course free to assert them in a separate action." These claims are valuable and as detailed below, have been asserted in arbitration.

18.     Efforts by my litigation counsel to find a resolution to the situation I found myself in were completely rebuffed by counsel for the judgment creditor. I was (and am) unemployed, facing not only the judgment on the 2019 Note, but also now an $11 million demand for a capital call in Fund III.  I have significant and growing concerns about the impact of this situation on my medical condition.

*Efforts to Settle:*

19.     I made a concerted effort to settle the issues with the Creditor through my litigation counsel, but when the Creditor refused to meaningfully respond or engage, I engaged bankruptcy counsel in or around March 2022.

20.     Almost immediately, my bankruptcy counsel reached out to Creditor's counsel to see what could be done to avoid a bankruptcy filing. Having spent my entire professional career in or around the distressed markets, the idea of filing a personal proceeding was the last resort. A second settlement offer was conveyed in excess of the previously agreed upon amounts in the Separation Agreement.  Over the course of weeks, my counsel provided volumes of financial disclosure to the Creditor. There was (and continues to be) an unfounded belief on the part of the Creditor that I was not being forthright about my assets, and a general disbelief that I could have depleted my assets so significantly.  The Creditor has alleged outright and without any evidence that I have engaged in a scheme to secret assets. These allegations are completely fabricated and are unbelievable to me given that I have regularly and frequently discussed with Fisch my medical, personal, and financial situation.  Indeed, the absence of personal liquidity is precisely why I required the loan under the 2019 Note.

21.     Nevertheless, in a continued effort to assuage these concerns and resolve the situation, I voluntarily turned over volumes of bank statements, investment account statements, closing statements from the purchases and sales of all the real estate (discussed herein), tax returns and credit card records going back to 2016. These disclosures were all made based upon the assurance by the Creditor's counsel that no settlement offer could be evaluated <u>and responded to</u> without full transparency.  To be fair, the Creditor's counsel represented that they would not discontinue efforts to collect upon their judgment, but they also indicated that they

would consider the voluntary submissions in good faith to see if a consensual resolution could be reached.

22.     The significant disclosures that I made supported the clear fact that I had accurately represented my financial picture and that no funds had been secreted. The unfortunate reality is that my wealth had been eroded due to significant investments into the funds, and the payment of claw back obligations to the funds, tax obligations to the State and Federal government, and construction costs for the Townhouse which went over budget largely due to unforeseen structural issues with the property.  My counsel expended significant effort to create and provide summaries to help direct the Creditor's attention to the pertinent disbursements over time.  None of these efforts resulted in any productive response whatsoever from the Creditor, who I now realize never had any intention of engaging in good faith.

23.     The Companies have locked me out of the investor portal, and I have no information whatsoever regarding the status of my various holdings in the funds, including the amount of my contributions over time. I do not know the value of my holdings, if they have been seized or if they have been applied to the judgment on the 2019 Note and if so, what credit has been given to the outstanding liability. I have also not been provided 2021 K-1s for any of the Ascribe funds which I need to complete my 2021 tax filings and only *just* received some tax reporting forms for some of the American Securities funds last week. These are all items that my counsel has requested on numerous occasions.  Despite my cooperation and voluntary turnover of documents and financial information, my requests for even the most basic information have been completely ignored.

24.     In addition to discovery devices served on me and my non-debtor spouse, recently two of my adult children have been served with subpoenas requiring the production of

documents and to sit for depositions without any good cause. There is absolutely no good faith basis to seek discovery from my adult children, who have no involvement in my financial affairs whatsoever. This unnecessary action can only be interpreted as an attempt to embarrass me and my children.

25.     The day before the filing of this Chapter 11 case, my counsel was advised that the Creditor intended to seek an *ex-parte* attachment of my and my wife's assets, which would leave us without any ability to pay defend ourselves, prosecute my affirmative claims against the Creditor, or even pay for basic living expenses (the "<u>Attachment Proceeding</u>"). It should be noted that my wife has separate counsel in place who has been known to and cooperating with Creditor's counsel in any requests for information since at least May 18, 2022.

*Intentions for the Chapter 11 Case:*

26.     Over the past year, the Creditor has launched a campaign to destroy me, in contravention of our agreements, employment law and equity. As a result of the complete lack of any good faith effort to find a resolution to this situation, I am left with no choice but to seek the protection of the Bankruptcy Court.

27.     I have significant claims against the Companies which are likely to offset a significant portion, if not all, of the liability due to the Creditor.  These claims have been set forth in detail in the Arbitration Statement, which was filed by my litigation counsel on July 25, 2022 with the American Arbitration Association, a copy of which is annexed hereto as **Exhibit "A"** and is incorporated herein by reference.

28.     It is important to note that the Creditor's counsel indicated its intention to commence the Attachment Proceeding only after my counsel informed them (as a courtesy) of my intention to commence arbitration and assert my claims.  Any success in the Attachment

Proceeding would have denied me my day in court and granted the Creditor victory by attrition. The bankruptcy filing was needed to neutralize the Creditor's economic advantages and permit me the opportunity to pursue my claims and defenses.

29.     It should also be noted that over the past few months, New York State Department of Taxation and Finance ("<u>NYSDTF</u>") has commenced a tax audit for which I have had to engage tax professionals. Given my various investment holdings in the funds (which is also complicated by my lack of access), my tax returns are complicated and the process, which is still ongoing, is slow and arduous.

30.     If my claims are successful in the Arbitration, not only will I not be responsible for the $11 million claim of Fund III, but I will likely be able to pay ALL of my rightful creditors in full which would include ASCP, LLC and NYSDTF, to the extent that NYSDTF's audit results in a liability.

31.     I have sought the protection of the Bankruptcy Court and the imposition of the automatic stay to protect the seizure of assets, to prevent continued harassment of my family, and to afford me my day in court. I intend to vigorously pursue the Arbitration claims against the Companies and complete the audit currently underway by NYSDTF. Once these claims by and against the estate can be liquidated, I intend to propose a Chapter 11 plan under the Bankruptcy Code which ensures the payment to ALL creditors in accordance with their priority and to obtain a discharge, if necessary, of any liabilities which remain unpaid under such a plan.

**Local Rule 1007-2(a)(2)**

32.     This case was not originally commenced under Chapter 7 or 13 of the Bankruptcy Code.

**Local Rule 1007-2(a)(3)**

33.     Upon information and belief, no committee was organized prior to the order for relief in this Chapter 11 case.

**Local Rule 1007-2(a)(4)**

34.     A list of the names and addresses of my 20 largest unsecured claims, excluding those who would not be entitled to vote at a creditors' meeting and creditors who are "insiders" as that term is defined in §101(31) of the Bankruptcy Code is annexed hereto as **Exhibit "B".**

**Local Rule 1007-2(a)(5)**

35.     There are no creditors holding secured claims against the Deponent.

**Local Rule 1007-2(a)(6)**

36.     The Debtor does not have a balance sheet. His details assets and liabilities will be disclosed in the filing of the Schedules of Assets and Liabilities shortly.

**Local Rule 1007-2(a)(7)**

37.     As an individual debtor, Local Rule 1007-2(a)(7) is not applicable.

**Local Rule 1007-2(a)(8)**

38.     None of my property is in the possession of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or any agent for such entity.

**Local Rule 1007-2(a)(9)**

39.     I am a party to two residential leases; the first is for the property located at 24 Kellogg Hill Road, Weston, CT 06883 and the other is 3126 Oak Road, Apartment 401, Walnut Creek, CA 94597 which is my daughter's apartment (and for which she is also a tenant, and she pays the rent entirely). I have also guaranteed the lease obligation for my residence located 14 Horatio Street, Apartment 15H, New York, NY 10014.

**Local Rule 1007-2(a)(10)**

40. My primary assets consist of cash which are held in three bank accounts; Fairfield County Bank, which is my main account, and two accounts at JP Morgan Chase which have de minimus balances. My other valuable assets are the claims set forth in the Arbitration Statement and my investments in certain funds controlled by the Companies. I am in possession of my books and records.

**Local Rule 1007-2(a)(11)**

41. The following is the only action pending against me which is pending before the American Arbitration Association and captioned, *ASOF Associates III, LLC v. Lawrence A. First*, Case No.: 01-22-0002-4465.

**Local Rule 1007-2(a)(12)**

42. As an individual debtor, Local Rule 1007-2(a)(12) is not applicable.

**<u>CONCLUSION</u>**

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: July 28, 2022                         */s/ Lawrence A. First*_____
                                                          Lawrence A. First

# EXHIBIT "A"

# Arbitration Statement

see attached



**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| |
|---|
| **Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐. There is no additional administrative fee for this service. |
| You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement. |

| Name of Respondent: American Securities LLC |
|---|

| Address: 590 Madison Avenue, 38th Floor |
|---|

| City: New York | State: New York | Zip Code: 10022 |
|---|---|---|
| Phone No.: (212) 476-8000 | Fax No.: | |

| Email Address: |
|---|

| Name of Representative (if known): Jantra Van Roy |
|---|

| Name of Firm (if applicable): Zeichner Ellman & Krause LLP |
|---|

| Representative's Address: 1211 Avenue of the Americas, 40th Floor |
|---|

| City: New York | State: New York | Zip Code: 10036 |
|---|---|---|
| Phone No.: 212-223-0400 | Fax No.: | |

| Email Address: jvanroy@zeklaw.com |
|---|

| The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration. |
|---|

| Brief Description of the Dispute: |
|---|
| The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration. |

| Dollar Amount of Claim: $ |
|---|

| Other Relief Sought: ☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs ☑ Punitive/Exemplary ☐ Other: |
|---|

| Amount enclosed: $ |
|---|
| In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☐ Standard Fee Schedule |

| Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute: |
|---|
| Pursuant to the governing arbitration agreement, the panel shall consist of three arbitrators with each party appointing one arbitrator, and the third to be appointed by the two party appointed arbitrators. |

| Hearing locale: New York, New York |
|---|
| *(check one)* ☐ Requested by Claimant ☑ Locale provision included in the contract |



| | | |
|---|---|---|
| Estimated time needed for hearings overall: | hours  or | days |

Type of Business:

Claimant: Individual Member of LLC          Respondent: Limited Liability Company

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?
No

Signature (may be signed by a representative):          Date:

Name of Claimant: Lawrence A. First

Address (to be used in connection with this case):

City:          State: Select...          Zip Code:

Phone No.:          Fax No.:

Email Address:

Name of Representative: Avery Samet

Name of Firm (if applicable): Amini LLC

Representative's Address: 131 W 35th Street, 12th floor

City: New York          State: New York          Zip Code: 10001

Phone No.: 212-490-4700          Fax No.:

Email Address: asamet@aminillc.com

To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.



**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐. There is no additional administrative fee for this service.

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent: **Ascribe Capital LLC**

Address: **590 Madison Avenue, 38th Floor**

| City: **New York** | State: **New York** | Zip Code: **10022** |
|---|---|---|

| Phone No.: **(212)-476-8091** | Fax No.: |
|---|---|

Email Address:

Name of Representative (if known): **Jantra Van Roy**

Name of Firm (if applicable): **Zeichner Ellman & Krause LLP**

Representative's Address: **1211 Avenue of the Americas, 40th Floor**

| City: **New York** | State: **New York** | Zip Code: **10036** |
|---|---|---|

| Phone No.: **212-223-0400** | Fax No.: |
|---|---|

Email Address: **jvanroy@zeklaw.com**

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

**The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.**

Dollar Amount of Claim: $

Other Relief Sought: ☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs ☑ Punitive/Exemplary
☐ Other:

Amount enclosed: $

In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☐ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

**Pursuant to the governing arbitration agreement, the panel shall consist of three arbitrators with each party appointing one arbitrator, and the third to be appointed by the two party appointed arbitrators.**

Hearing locale: **New York, New York**

*(check one)* ☐ Requested by Claimant ☑ Locale provision included in the contract

**Please visit our website at www.adr.org/support to file this case online.**
**AAA Customer Service can be reached at 800-778-7879.**


| Estimated time needed for hearings overall: | hours or | days |
|---|---|---|

**Type of Business:**

Claimant: Individual Member of LLC          Respondent: Limited Liability Company

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?
**No**

| Signature (may be signed by a representative): | Date: |
|---|---|

Name of Claimant: Lawrence A. First

Address (to be used in connection with this case):

| City: | State: Select... ▼ | Zip Code: |
|---|---|---|

| Phone No.: | Fax No.: |
|---|---|

Email Address:

Name of Representative: Avery Samet

Name of Firm (if applicable): Amini LLC

Representative's Address: 131 W 35th Street, 12th floor

| City: New York | State: New York | Zip Code: 10001 |
|---|---|---|

| Phone No.: 212-490-4700 | Fax No.: |
|---|---|

Email Address: asamet@aminillc.com

To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.


**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐. There is no additional administrative fee for this service.

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent: American Securities Opportunities Advisors, LLC

Address: 299 Park Ave, 34th Floor

| City: New York | State: New York | Zip Code: 10171 |
|---|---|---|
| Phone No.: (212) 476-8000 | Fax No.: | |

Email Address:

Name of Representative (if known): Jantra Van Roy

Name of Firm (if applicable): Zeichner Ellman & Krause LLP

Representative's Address: 1211 Avenue of the Americas, 40th Floor

| City: New York | State: New York | Zip Code: 10036 |
|---|---|---|
| Phone No.: 212-223-0400 | Fax No.: | |

Email Address: jvanroy@zeklaw.com

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Dollar Amount of Claim: $

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Punitive/Exemplary
☐ Other:

Amount enclosed: $

In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☐ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Pursuant to the governing arbitration agreement, the panel shall consist of three arbitrators with each party appointing one arbitrator, and the third to be appointed by the two party appointed arbitrators.

Hearing locale: New York, New York

*(check one)* ☐ Requested by Claimant  ☑ Locale provision included in the contract



| | | |
|---|---|---|
| Estimated time needed for hearings overall: | hours  or | days |

| Type of Business: |
|---|
| Claimant: Individual Member of LLC          Respondent: Limited Liability Company |

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?
**No**

| Signature (may be signed by a representative): | Date: |
|---|---|

Name of Claimant: **Lawrence A. First**

Address (to be used in connection with this case):

| City: | State: **Select...** ▼ | Zip Code: |
|---|---|---|

| Phone No.: | Fax No.: |
|---|---|

Email Address:

Name of Representative: **Avery Samet**

Name of Firm (if applicable): **Amini LLC**

Representative's Address: **131 W 35th Street, 12th floor**

| City: **New York** | State: **New York** | Zip Code: **10001** |
|---|---|---|

| Phone No.: **212-490-4700** | Fax No.: |
|---|---|

Email Address: **asamet@aminillc.com**

To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

**LAWRENCE A. FIRST v. AMERICAN SECURITIES LLC, ASCRIBE CAPITAL LLC AND AMERICAN SECURITIES OPPORTUNITIES ADVISORS, LLC**

*as consolidated with:*

**ASCRIBE ASSOCIATES III, LLC v. LAWRENCE A. FIRST**

I.     **The Parties**

1.     Claimant Lawrence A. First ("First") is an attorney and investment manager who worked for the respondent companies for over 13 years.

2.     The respondents are American Securities LLC ("American Securities"), Ascribe Capital LLC ("Ascribe Capital") and American Securities Opportunities Advisors, LLC ("ASOA") (together, "Respondents"), three affiliated investment companies that at the time of the events in question were each managed and controlled by Michael G. Fisch ("Fisch").

3.     As discussed below, First's employment with the Respondents was governed by a January 31, 2019 Amended and Restated Letter Agreement (the "Employment Agreement") which provides that any disputes would be adjudicated in arbitration.

4.     At the time of the Employment Agreement, American Securities LLC was the managing member of ASOA and the sole member of Ascribe Capital LLC.  In addition, Fisch served as President and Chief Executive Officer of each Respondent.

5.     As discussed below, on June 30, 2021, Ascribe Capital LLC merged with Birch Grove Capital LP ("Birch Grove") to form AS Birch Grove LP ("AS Birch Grove"), with Fisch serving as one of the Chief Executive Officers of the new entity.

6. By this arbitration, First seeks to enforce his Separation Agreement (defined below), as well as damages from the Respondents for the manner in which they ousted him from his positions with the Respondents.

## II. First's Contractual Rights Under the Employment Agreement

### A. The Management of Investment Funds Pursuant to the Employment Agreement

7. Respondents managed over $1 billion in invested assets, principally through their management of multiple investment funds.

8. Ascribe Capital served as the investment advisor to certain funds and ASOA served as the investment advisors to other funds. American Securities managed and controlled both Ascribe Capital and ASOA.

9. Pursuant to Section 1(a) of the Employment Agreement, the Respondents agreed that First would manage at least four investment funds:

- The management and operation of Ascribe Capital would be vested exclusively in American Securities;

- First would serve as Managing Director and Chief Investment Officer of Ascribe Capital;

- Ascribe Capital and ASOA would serve as the sole investment advisors to the four defined funds that First would manage;

- On behalf of Ascribe Capital and ASOA, respectively, First would manage the day-to-day investment activities of: Ascribe Opportunities Fund, L.P. ("Fund I"); Ascribe Opportunities Fund II, L.P. ("Fund II"); Ascribe Opportunities Fund III, L.P. and its

parallel partnerships ("Fund III"); and Ascribe Opportunities Fund IV, L.P. and its parallel partnerships ("Fund IV"), each subject to additional terms.[1]

- First would also manage the day-to-day investment activities of any future Ascribe fund, specifically: "any other pooled investment vehicle or managed account raised as part of the 'Ascribe' platform (including any successor fund to Fund IV) (each, a 'Future Fund,' and together with Fund III and Fund IV, the 'Advisor Funds')."

10.     The Respondents agreed that all hiring, firing and compensation decisions in respect of Ascribe Capital employees (and American Securities employees dedicated primarily to the Ascribe Funds) needed to be initiated by First.  (Employment Agreement, Section 1(b)).  First agreed that after initiating such decision, he could not implement the decision without the express approval of American Securities.  (*Id.*)

11.     The Respondents further agreed that any profit-sharing percentages with respect to Fund IV or Future Funds could only be allocated to Ascribe Capital employees with the agreement between both First and American Securities.  (*Id*. at section 1(c)).

12.     The Respondents further agreed on how investment decisions would be made with respect to the funds that First managed.  (*Id.*, section 1(d)).  All investment decisions for the ASOA Funds (Fund I and Fund II), and for Fund III, would be made consistent with past practice.  All investment decisions for Fund IV and any Future Fund would be made subject to the approval of an investment committee.  First, Fisch and another individual appointed by American Securities were named to the investment committee for Fund IV.  The Respondents agreed on a complicated decision-making process for the investment committee (investments

---

[1] Fund I and II are defined as the "ASOA Funds," for which ASOA was the advisor.  Fund III and Fund IV were defined as the "Ascribe Funds," for which Ascribe Capital was the advisor.

over $10 million generally required unanimous consent, and other decisions would be made by majority subject to veto by American Securities). (*Id.*).

13.     The Respondents also agreed that any services or personnel provided by American Securities with respect to the above funds would be billed to Ascribe Capital or ASOA, as applicable. (*Id.*, 2(a)).

        B.     Compensation of First

14.     Pursuant to Section 3 of the Employment Agreement, the Respondents agreed that First would receive a bonus each year equal to 50% of the Net Profits of Ascribe Capital as follows:

> Sharing of Net Profits.    Subject to Section 4(b) hereof and for so long as the Executive is an employee of the Advisor and/or its affiliates, the Executive shall be entitled to a bonus equal to 50% (the Executive's "Percentage Interest") of Net Profits for each fiscal year less any base compensation previously paid to the Executive for such fiscal year (but expressly excluding any carried interest received by the Executive or any bonus paid to the Executive in respect of Fund I or Fund II in respect of such fiscal year). Such bonus shall be payable as soon as reasonably practicable on or around the end of each fiscal year as agreed by the parties. The Executive shall be afforded a reasonable right to inspect the financial records of the Advisor to confirm the calculation of such bonus. "Net Profits" means, with respect to a fiscal year, an amount equal to (a) the amount of Management Fees paid to the Advisor in respect of all Ascribe Funds during such fiscal year and transaction fees, directors' fees, monitoring fees, consulting fees, advisory fees or break-up fees paid to the Advisor in connection with the Ascribe Funds' portfolio investments or other activities of the Advisor in respect of the Ascribe Funds received during such fiscal year minus (b) Allocable Expenses in respect of the Ascribe Funds for such fiscal year. For the avoidance of doubt, Net Profits shall not include any income or expense in respect of any fund other than the Ascribe Funds.

(Id., Section 3).[2]

---

[2] As referenced in this paragraph and discussed below, First also received yearly bonuses in respect of the ASOA Funds, as well as carried interest in certain funds.

C. <u>Termination of Employment</u>

15.     First's employment under the Employment Agreement would be treated as "'at will,' meaning that [First's] employment may be terminated by the Advisor and/or its affiliates or by [First] for any reason or no reason at all, unless prohibited by law." (*Id.*, Section 4(a)).

16.     If First's tenure was terminated without Cause or he resigned for Good Reason (both defined below), First would be entitled to 50% of his Percentage Interest (or 25% of Net Profits) of the Current Ascribe Fund. (*Id.*, Section (4(b)).

17.     In addition, First would have the ability to use his investment track record with the Funds to disclose to any future prospective investors, subject to various specified procedures. (*Id.*, Section 4(c)).

18.     Pursuant to Section 4(b) of the Employment Agreement, "Good Reason" would have the definition contained in First's Admission Letter to the general partner of the Current Ascribe Fund (Fund IV).

19.     That Admission Letter defined Good Reason as follows:

> "Good Reason" shall mean your voluntary resignation within 30 business days following (w) receipt by you of actual notice from American Securities of a material and adverse reduction in the nature or scope of your responsibilities or duties to the Advisor in respect of the Funds, (x) the Advisor moving your principal office outside of New York, New York or to any location more than 35 miles from New York, New York, (y) material breach by the Company of the terms of the LLC Agreement, the letter agreement between you, the Advisor, American Securities Opportunities Advisors, LLC and American Securities dated as of the date hereof (the "Letter Agreement") or this Admission Letter or (z) you no longer directly reporting to Michael G. Fisch (or if Mr. Fisch is no longer actively running American Securities LLC, to his successor) or any employee of the Advisor, other than you, reporting directly to Mr. Fisch (or such successor).

(Admission Letter, p.2).

20.     Pursuant to Section 4(b) of the Employment Agreement, "Cause" would have the

definition contained in the "Ascribe IV LLC Agreement," with two modifications to that

agreement's terms.  (Employment Agreement, 4(b)).  The Ascribe IV LLC Agreement was

specifically defined as the "Amended and Restated Limited Liability Company Agreement of

Ascribe Associates IV, LLC, a Delaware limited liability company, dated October 31, 2017."

(Employment Agreement, 1(c)).

        D.  Dispute Resolution

21.     Finally, the Employment Agreement provided that all disputes would be referred

to arbitration:

> Arbitration.     To the fullest extent permitted by law, any dispute,
> controversy or claim arising out of or relating to this Agreement, or
> the negotiation, execution or performance of this Agreement
> (including any claim or cause of action based upon, arising out of or
> related to any representation or warranty made in or in connection
> with this Agreement or as an inducement to enter into this
> Agreement), or the breach or alleged breach of this Agreement or
> the Advisor's affairs, whether arising during the term of this
> Agreement or at or after its termination, shall be finally settled by
> binding arbitration in accordance with the GP LLC Agreement of
> the Current Ascribe Fund; provided that, notwithstanding anything
> to the contrary contained in the GP LLC Agreement of the Current
> Ascribe Fund, (i) each party shall bear its own attorneys' fees
> incurred in connection with such binding arbitration, (ii) other
> expenses and costs incurred in such binding arbitration shall be
> borne equally between the parties and (iii) in connection with any
> such dispute, controversy or claim, American Securities shall not
> withhold from the Executive any carried interest distributions or
> portions thereof (but may withhold from the Executive's share of
> Net Profits).

(Employment Agreement, Section 11).   The Second Amended and Restated LLC Agreement of

Ascribe Associates IV, LLC – the "GP LLC Agreement of the Current Ascribe Fund," the "most

recently raised Ascribe Fund" as "Current Ascribe Fund" is defined in 1(c) of the Agreement –

referenced in the above provision provides:

SECTION 10.1.        Arbitration, Waiver of Rights to Accounting/ Partition.

(a) To the fullest extent permitted by law and subject to Section 10.13, any dispute, controversy or claim arising out of or relating to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), or the breach or alleged breach of this Agreement or the Company's affairs or the rights or interests of the Members, whether arising during the term of the Company or at or after its termination or during or after the liquidation of the Company (a "Dispute"), shall be finally settled by confidential binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association to be held in New York, New York, and shall consist of three arbitrators, with one arbitrator to be appointed by each party and the third to be appointed by the two arbitrators so appointed. Expenses, attorneys' fees and costs incurred in such binding arbitration shall be borne by the non-prevailing party, as determined by the arbitrator.

As such, arbitration for First's claims deriving from this Agreement is proper in this venue.

### III.    First's Other Relationships with Respondents and Their Affiliates

22.     First received a base salary of $500,000 a year from Ascribe Capital.  In addition, he was enrolled in the medical, dental and vision plans of American Securities.

23.     First received discretionary bonuses due to his management of the ASOA Funds (Funds I and II).  Although these were ultimately discretionary, the parties understood these to be an important part of First's compensation as is customary in the financial services industry.

24.     In addition, First had committed $12.5 million in capital towards Fund III and Fund IV.  Those commitments entitled him to membership interests and additional profit-sharing percentages in those funds.  Pursuant to his Admission Letters to Fund III and Fund IV, upon termination without Cause or resignation for Good Reason, First would be entitled to a portion of his profit percentage in the Funds.  That portion would be (i) at least 75% of his profit-sharing

percentage with respect to funded portfolio investments and (ii) 25% of his profit-sharing percentage with respect to unfunded portfolio investments.

25.     In June 2019, First entered into a promissory note with ASCP, LLC (an entity owned by Fisch) pursuant to which First promised to repay $6,019,914, plus 5.5% interest by June 1, 2021.  The note constituted borrowings for a capital call for one of the Respondent-managed funds. As of June 18, 2021, approximately $4.7 million remained outstanding on the Note for which ASCP, LLC had not instituted or noticed any default.

## IV.     Respondents Wrongfully Terminate First

### A.  Introduction

26.     Respondents – principally through their executive Michael Fisch – executed a bait and switch on First.

27.     The bait:  As discussed below, Fisch secretly negotiated a merger of Ascribe Capital with Birch Grove.  Because this would violate the Employment Agreement, Fisch asked First to enter into a separation agreement relinquishing all of First's rights under the Employment Agreement.  In addition, Fisch sought First's cooperation to effectuate the transition from Ascribe Capital to Birch Grove.  In exchange for these asks, Fisch offered First a wind-up of all of First's interests and obligations to and from the Respondent entities and their affiliates.  First agreed.

28.     The switch:  After obtaining First's concessions, Fisch backtracked on the agreement they had negotiated, but never formally signed.  He did so even though both First and the Respondents had taken material actions in reliance on the terms of the separation agreement.  Fisch set about to terminate First for "Cause," even though First had already agreed to terminate his Employment Agreement months earlier.  By doing so, Respondents purported to have stripped

First of all of his termination rights under *both* the separation agreement and the Employment Agreement.

###### B. The Bait:  The Separation Agreement

29.     In March 2021, Fisch and First discussed hiring an executive for the two of them to groom to ultimately replace First as Chief Investment Officer.  The reason they had this discussion was because First had recently turned 59, and the other investment executives at Ascribe Capital were too junior.  In addition, Fisch knew that First had been diagnosed with Parkinson's disease several years earlier.  It was agreed that Fisch would lead the hiring search for such an executive.

30.     On June 18, 2021, Fisch informed First that he had secretly signed an agreement the night before to merge Ascribe Capital into Birch Grove, a larger asset management firm (the "Merger").  The negotiations with Birch Grove had been kept secret from First and the funds' investors, and First had not been given any say in the decision to merge.

31.     At that meeting, Fisch informed First that his Employment Agreement would necessarily cease and that First, along with most of his investment team, would be terminated.[3] Fisch told First that the two of them needed to negotiate a separation agreement before Fisch approached the investors to get them on board with the Merger.  In addition, Fisch asked First to stay on to help with the transition to the new company.  Fisch specifically asked First to propose terms to govern the transition period, First's role with the new firm, First's exit from the various positions and the unwinding of First's loan and clawback obligations.  Fisch asked First to step down as Chief Investment Officer, but to remain on as a senior advisor with the new firm.

---

[3] The Merger, by definition, violates the Employment Agreement which governed the control and management of the Funds.

32.     Per Fisch's request, First submitted proposed terms that same day.  Based upon Fisch's response, First understood that they had agreed on terms subject to papering of their deal. First and Fisch sent the terms to their respective attorneys to formalize it, and they both moved forward as per their agreed terms.

33.     Over the weekend of June 19-20, First worked with Ascribe Capital's Chief Administrative Officer to prepare Monday's presentation to the employees concerning the Merger. And, on Monday, June 21, 2021, Fisch and First met with the team and participated in the presentation of the Merger and how the company would forward.  Fisch told the team that First would be stepping down as Chief Investment Officer upon completion of the Merger and would be continuing as senior advisor to assist with the transition, all per the agreement between First and Fisch.[4]

34.     The following day, First spoke with Fisch who assured him that the deal was complete.  Fisch told First that everything would be fine and that First should "don't worry and go do some Yoga." (Fisch knew that First did Yoga to help with his Parkinson's disease).

35.     On June 29, 2021, Fisch emailed First that the Merger would likely close the next day and that Respondent's attorneys were finalizing the separation agreement that they had reached:

> With what I believe are minor tweaks to your proposal, Weil is putting together a fleshed out term sheet [for] your perusal.  Hope to get this to you later today.

---

[4] Fisch further understood that, under the Employment Agreement, he could not unilaterally fire the investment team without First's initiating such termination.

Fisch blamed tax issues for the delay in papering the separation agreement. On June 30, Respondents' attorneys submitted a draft separation agreement that was consistent with the deal reached between Fisch and First on June 18, 2021.

36. On that day, First and Fisch discussed the "minor tweaks" in Respondents' fleshed-out term sheet over email and conversations. They agreed on a default term, and that First would stay on for a full year in exchange for the consideration being offered (all as discussed below).

37. By July 1, 2021, First understood that they had agreed on all material terms, and while they did not have a signed agreement, he understood that they had a deal in principle for First to stay on to coordinate the transition to the merged Birch Grove entity and to separate from the Respondents for good. [See below for the terms of the agreement (the "Separation Agreement")].

38. At the time, Respondents needed First's cooperation to manage the existing investments consistent with their obligations to the investors under the various fund documents. In addition to managing the funds on a day-to-day basis, First also sat on the boards of four public and private companies in which the funds had invested.

39. On July 1, 2021, Fisch emailed First to inform him that the Merger had closed and that his lawyers were turning their term sheet into a formal document. Over the next several weeks, the parties' attorneys exchanged draft documents and comments, all of which were consistent with the key material terms of the Separation Agreement that Fisch and First had reached. (The draft Separation Agreements contained the date "as of July 1, 2021" because as of that date Ascribe Capital had merged into Birch Grove).

40. The Separation Agreement negotiated between First and Fisch provided for the following principal terms:

- First would transition from Chief Investment Officer of Ascribe Capital to "Senior Advisor" to AS Birch Grove, and would continue on in that role for one year or until the new firm gave him two-weeks notice;

- First would continue as a member of the investment committee of Fund II, Fund III and Fund IV;

- First would give up all compensation, and instead be paid $20,000 a month;

- First would give up all rights under the Employment Agreement, including his rights to 50% Share of Net Profits or 25% share upon separation;

- "Promptly following the sale" of First's residence, First would pay an aggregate amount of $5 million to (a) ASCP, LLC (another Respondent-affiliated entity) in repayment of an outstanding loan to First and (b) to an affiliate of Fund III, as a capital contribution to applied to First's clawback obligation;

- First would transfer his interests in Fund II and Fund III to Respondent affiliates in exchange for fair market value (to be offset against First's clawback obligation), plus 25% of the capital appreciation in such funds during the separation period;

- The Respondent affiliates would assume First's clawback obligation to Fund III (as reduced by the above);

- First would assign to Respondent affiliates his interests in Fund IV in consideration for the assumption of his unfunded capital commitments;

- First would remain enrolled in American Securities medical, dental and vision plans and would be eligible for COBRA after his final separation;[5]

---

[5] As Respondents knew, this term was important to First because he had recently been diagnosed with Parkinson's disease.

- First would cooperate with the Respondents and keep all information confidential, and both parties agreed to mutual non-disparagement;

- First and Respondents would execute a mutual general release, including that First would release the Respondents from any employment discrimination liability; plus

- Numerous terms and conditions inherent in a separation agreement of this type.

*See* last draft of as of July 1, 2021, Separation Agreement. Importantly, the Separation Agreement provided that if First quit before July 1, 2022, then the assumptions of the clawback obligation to Fund III would be voided.

41. As of July 1, 2021, both Fisch and First understood that they had agreed to the terms of the Separation Agreement, and both acted in reliance on that agreement.

42. For example, First became senior advisor at AS Birch Grove. Respondents ceased paying him his previous $500,000 base salary, and instead began paying First – and First accepted – $20,000 a month as provided for in the Separation Agreement. First and Respondents informed his counterparties (such as investors and the public) that he had become senior advisor (as opposed to Chief Investment Officer). Ascribe Capital distributed an announcement to its investors, which, in accordance with the Separation Agreement, disclosed that AS Birch Grove would now be managed day-to-day by Jonathan Berger and Andrew Fink (Birch Grove's principals, as opposed to First), that Berger and Fisch would jointly control the investment committee (as opposed to the Employment Agreement) and that First would become senior advisor to AS Birch Grove, while remaining on the investment committees of Funds II-IV.

43. By way of another example, on July 1, 2021, First acquiesced to the firing of his investment team (even though his Employment Agreement would have prohibited it).

44.     For another example, First actively managed (now) AS Birch Grove's investment portfolio and handled weekly calls with the (now) senior AS Birch Grove members. In that capacity, he reported to Jonathan Berger and Andrew Fink. He also continued to actively serve on the four portfolio company boards of directors. First performed these acts pursuant to the Separation Agreement, even though he now would not be compensated with bonuses, a share of Net Profits or other compensation.

45.     The Respondents knew that First was relying on the Separation Agreement to perform each of the above acts.

46.     At no point did the Respondents or anyone else at Respondents or Birch Grove, make any complaint about First's performance as senior advisor.

C.     The Switch: The Termination for "Cause"

47.     Once Respondents had obtained First's (a) agreement to reduction in title, (b) agreement to reduction in salary, (c) agreement to fire his investment team, (d) cooperation with managing the Funds through the Merger, and (e) general cooperation with the Merger, they reneged on the Separation Agreement and refused to sign it.

48.     On September 23, 2021, Ascribe Capital issued a capital call to all members of Fund IV. Respondents knew that First lacked the funds to meet the capital call. They further knew that First had already agreed to relinquish his interests in Fund IV as of July 1, 2021, and that, therefore, First had no obligation to make a capital call.

49.     The same day, when First reminded Fisch of these facts, Fisch cleverly responded that First was a lawyer by training and should know that First owed all monies due "until there is an executed agreement to the contrary, which as you know there is not."

50. On November 9, 2021, Ascribe Capital issued a second capital call to all members of Fund IV.

51. On November 19, 2021, American Securities emailed First informing him that he was a defaulting member of Fund IV.

52. On November 4, 2021, ASCP, LLC commenced an action in New York State Court against First seeking to recover on the loan, the repayment of which the parties had provided for in the Separation Agreement.

53. On November 30, 2021, Fisch sent First a letter on American Securities letterhead purporting to terminate First's employment with Ascribe Capital, American Securities and AS Birch Grove (the "Termination Notice"). Fisch's letter did so even though First only had employment with AS Birch Grove pursuant to the Separation Agreement and Ascribe Capital had purportedly merged into AS Birch Grove.

54. The Termination Notice purported to terminate First from the above entities for Cause. The Termination Notice relied on First's failure to make the September and November Fund IV capital calls, even though First had already agreed to surrender his membership interests in Fund IV in the Separation Agreement. As such, the Termination Notice stated that "the Firm" was exercising its discretionary right to terminate First's employment for Cause.

55. Notwithstanding the Separation Agreement, Respondents had the customary practice of not requiring exiting employees to make capital calls. Respondents wanted investors to know (and had previously disclosed to them) that the people making decisions for the Funds had interest in the Funds. The converse was also true; Respondents knew that investors did not want individuals who no longer would run the Funds to have economic interests in the Funds. Nevertheless, despite having this long-standing business practice, Respondents did not employ this

practice for First and required him to make the capital calls in order to generate their Termination Notice.

56.    The Termination Notice terminated First effective immediately, and without providing him the two-weeks notice agreed to in the Separation Agreement.

57.    The Termination Notice makes no reference to the Employment Agreement.

## V.    Post-Termination Events

58.    By Decision and Order dated March 4, 2022, ASCP, LLC obtained summary judgment against First on its loan.  The Court found that the loan agreement provided that it could only be modified by "an instrument in writing and signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought."  (Decision and Order at 1).  Therefore, the Court found that the "unsigned separation agreement" could not affect First's liability under the loan.  (Id.).

59.    Instead, the Court ruled that "[t]o the extent defendant [First] has any claims against plaintiff or its related entities regarding his employment or other claims based on other agreements he is of course free to assert them in a separate action."  First brings such claims here.

60.    On June 10, 2022, an affiliate of Fund III commenced an arbitration before this arbitration organization seeking payment of the Fund III clawback that the Respondents' had agreed to assume pursuant to the Separation Agreement.

61.    In January 2022, First sold his house, but Respondents would not accept payment of $5 million pursuant to the Separation Agreement.

62.    First continues to suffer from Parkinson's disease and remains unemployed.

63.    He is unable to obtain work in his field due to his termination for Cause.

64.     Respondents have stripped First of his rights as a member in the Funds by denying him access to his investor portal, and so he has no information concerning the performance of the Funds or distributions made by the Funds.  In addition, Respondents have failed to provide First with his 2021 Schedule K-1.  Finally, Respondents stripped First of his access to his company emails, over which much of the events described herein transpired.

## CLAIMS FOR RELIEF

### BREACH OF CONTRACT

65.     First had a valid contract with each of the Respondents in the form of the Employment Agreement.

66.     The Employment Agreement terminated when Ascribe Capital merged into AS Birch Grove as of July 1, 2021.

67.     First believed that he had a valid contract with Respondents in the form of the Separation Agreement.  First reasonably relied on the Separation Agreement in taking the actions described above.  In addition, Respondents' actions in accordance with the Separation Agreement reasonably gave the impression that Respondents had similarly agreed to the terms of the Separation Agreement.

68.     First therefore seeks a Declaration that the Separation Agreement is valid and seeks damages for Respondents' breach of the Separation Agreement.  Those damages include the assumption of the Fund III clawback obligation and the right to pay $5 million payment on the loan, First's damages for having to deal with the loan litigation, and damages for being terminated with Cause and ousted from his medical plans.

69.     In the alternative, First seeks a declaration that the Employment Agreement terminated as of July 1, 2021 when Ascribe Capital merged with Birch Grove.  In that case, First is entitled to all his benefits and compensation as if he were terminated without cause on that date.

70.     In addition, First seeks damages for what the Respondents caused through their purported termination for "Cause" after First had already voluntarily agreed to separate.[6]

## UNJUST ENRICHMENT

71.     In the alternative, First seeks compensation in the form of unjust enrichment from Respondents for unjustly obtaining First's necessary cooperation in effectuating the merger of Ascribe Capital with Birch Grove.

72.     Any benefit (for example, earnings, revenues or profits) which Respondents obtained as a result of the Merger could only have been realized through First's actions, which Respondents deceptively obtained.

## DISCRIMINATORY TERMINATION

73.     Respondents knew that First was nearly 60 years old and had been diagnosed with Parkinson's disease, which affected his day-to-day life.

---

[6] To the extent this tribunal considers promissory reliance to be a separate cause of action from breach of contract, this petition should be construed as also asserting such a claim.

74.     As such, First was in a protected class due to his disability under the American With Disabilities Act of 1990,[7] New York State Human Rights Law[8] and New York City Human Rights Law.[9]

75.     First was also in a protected class due to his age under the Age Discrimination in Employment Act of 1967,[10] New York State Human Rights Law[11] and New York City Human Rights Law.[12]

76.     Nevertheless, Respondents improperly contrived to terminate First as discussed above, with First's disability and age serving as key factors for them doing so.

77.     In addition, in the course of doing so, Respondents treated First differently from similarly situated employees.

78.     Following First's termination, Respondents replaced First with a younger investment adviser who was not suffering from Parkinson's.

---

[7] The ADA bars employment discrimination against "a qualified individual with a disability" because of the person's disability. 42 U.S.C. § 12112(a). A "qualified individual with a disability" is someone who (i) has a disability and who, (ii) with or without reasonable accommodation, can perform (iii) the essential functions of the position at issue. 42 U.S.C. § 12111(8). Section 3 of the ADA, 42 U.S.C. § 12102(2), defines the term "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

[8] NYSHRL prohibits employment discrimination because of disability. N.Y. Exec. Law § 296(2). "Disability" is defined as "(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques, or "(b) a record of such impairment, or "(c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held."

[9] NYCHRL prohibits discrimination "because of the actual or perceived . . . disability of any person." N.Y.C. Admin. Code § 8-107(1)(b). "Disability" means "any physical, medical, mental or psychological impairment, or a history or record of such impairment." § 8-102(16).

[10] The ADEA prohibits employers from basing hiring, firing, or any other employment decisions on the fact that one is age 40 or older. 29 U.S.C. § 631.

[11] NYSHRL prohibits all employers, regardless of size, from making hiring, firing or other employment decisions based on age. N.Y. Exec. Law § 296(2).

[12] NYCHRL prohibits employers with four or more employees from making hiring, firing or any other employment decisions based on age, even if you are under 40 years old. N.Y.C. Admin. Code § 8-107(1)(b), § 8-102(19).

79.     First has suffered harm in the form of lost compensation and benefits and through his inability to obtain another similar position.

80.     First seeks damages and attorney's fees against Respondents for that harm.


**AMINI LLC**

Avery Samet
131 West 35th Street, 12th Floor
New York, NY 10001
asamet@aminillc.com
Tel.: (212) 490-4700
*Attorneys for Claimant*

# EXHIBIT "B"

# TWENTY LARGEST UNSECURED CREDITORS

see attached

| Debtor 1 | Lawrence A. First | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the: SOUTHERN DISTRICT OF NEW YORK

Case number 22-11020
(if known)

☐ Check if this is an
amended filing

## B 104

# For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims Against You and Are Not Insiders                                   12/15

If you are an individual filing for bankruptcy under Chapter 11, you must fill out this form. If you are filing under Chapter 7, Chapter 12, or Chapter 13, do not fill out this form. Do not include claims by anyone who is an insider. Insiders include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20 percent or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor.   11 U.S.C. § 101.   Also, do not include claims by secured creditors unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information.

**Part 1:**  **List the 20 Unsecured Claims in Order from Largest to Smallest.   Do Not Include Claims by Insiders.**

**Unsecured claim**

**1**

American Express
200 Vesey Street
New York, NY 10285

_____

_____
Contact

_____
Contact phone

**What is the nature of the claim?**   Credit card purchases   $660.00

**As of the date you file, the claim is:** Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
☒ None of the above apply

**Does the creditor have a lien on your property?**
☒ No
☐ Yes. Total claim (secured and unsecured)
         Value of security:   -  _____
         Unsecured claim      _____

**2**

American Express
Attn: Legal Department
200 Vesey Street
New York, NY 10285

_____

_____
Contact

8005284800
Contact phone

**What is the nature of the claim?**   Credit card purchases   $99.00

**As of the date you file, the claim is:** Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
☒ None of the above apply

**Does the creditor have a lien on your property?**
☒ No
☐ Yes. Total claim (secured and unsecured)
         Value of security:   -  _____
         Unsecured claim      _____

B104 (Official Form 104)          For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims          Page 1

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com                                                                Best Case Bankruptcy

**3**

ASCP, LLC
590 Madison Avenue, 38th Floor
New York, NY 10022

**What is the nature of the claim?**    Judgment Entered
3/30/2022                  $4,726,830.29

**As of the date you file, the claim is:** Check all that apply

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed
- ☒ None of the above apply

**Does the creditor have a lien on your property?**

Contact

Contact phone

- ☒ No
- ☐ Yes. Total claim (secured and unsecured)
  - Value of security:                    -
  - Unsecured claim

---

**4**

ASCRIBE Associates III, LLC
590 Madison Avenue, 38th Floor
New York, NY 10036

**What is the nature of the claim?**                          $11,204,331.00

**As of the date you file, the claim is:** Check all that apply

- ☐ Contingent
- ☐ Unliquidated
- ☒ Disputed
- ☐ None of the above apply

**Does the creditor have a lien on your property?**

Contact

Contact phone

- ☒ No
- ☐ Yes. Total claim (secured and unsecured)
  - Value of security:                    -
  - Unsecured claim

---

**5**

JP Morgan Chase Bank
Attn: Legal Department
100 Corporate Park Drive
West Harrison, NY 10604

**What is the nature of the claim?**    Credit card purchases    $100.00

**As of the date you file, the claim is:** Check all that apply

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed
- ☒ None of the above apply

**Does the creditor have a lien on your property?**

Contact

Contact phone

- ☒ No
- ☐ Yes. Total claim (secured and unsecured)
  - Value of security:                    -
  - Unsecured claim

---

**6**

JP Morgan Chase Bank
Attn: Legal Department
100 Corporate Park Drive
West Harrison, NY 10604

**What is the nature of the claim?**    Credit card purchases    $10.00

**As of the date you file, the claim is:** Check all that apply

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed
- ☒ None of the above apply

**Does the creditor have a lien on your property?**

- ☒ No

B 104 (Official Form 104)          For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims          Page 2

Software Copyright (c) 1996-2022 Best Case, LLC  -  www.bestcase.com                                                          Best Case Bankruptcy

| Contact |  | ☐ Yes. Total claim (secured and unsecured) | |
| Contact phone |  | Value of security: | - _____ |
|  |  | Unsecured claim | _____ |

---

**7**    Monticello Motor Club LLC
548 Broadway
Monticello, NY 12701

**What is the nature of the claim?**    Membership Dues    $7,308.00

**As of the date you file, the claim is:** Check all that apply
☐ Contingent
☐ Unliquidated
☒ Disputed
☐ None of the above apply

**Does the creditor have a lien on your property?**

| Contact | ☒ No |
|  | ☐ Yes. Total claim (secured and unsecured) |
| Contact phone | Value of security: - _____ |
|  | Unsecured claim _____ |

---

**8**    NYS Dept. of Taxation & Finance
Bankruptcy/ Special Procedures
Section
PO Box 5300
Albany, NY 12205-0300

**What is the nature of the claim?**    Tax Audit    Unknown

**As of the date you file, the claim is:** Check all that apply
☐ Contingent
☒ Unliquidated
☒ Disputed
☐ None of the above apply

**Does the creditor have a lien on your property?**

| Contact | ☒ No |
|  | ☐ Yes. Total claim (secured and unsecured) |
| Contact phone | Value of security: - _____ |
|  | Unsecured claim _____ |

---

**9**    Samantha & Peter Knight
851 Lyndon Street
South Pasadena, CA 91030

**What is the nature of the claim?**    Guaranty of Lease    Unknown

**As of the date you file, the claim is:** Check all that apply
☒ Contingent
☒ Unliquidated
☐ Disputed
☐ None of the above apply

**Does the creditor have a lien on your property?**

| Contact | ☒ No |
|  | ☐ Yes. Total claim (secured and unsecured) |
| Contact phone | Value of security: - _____ |
|  | Unsecured claim _____ |

---

| Part 2: | **Sign Below** |

Under penalty of perjury, I declare that the information provided in this form is true and correct.

X    /s/ Lawrence A. First _____        X    _____
Lawrence A. First                                        Signature of Debtor 2
Signature of Debtor 1

B 104 (Official Form 104)    For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims    Page 3

Software Copyright (c) 1996-2022 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

| Debtor 1 | Lawrence A. First | Case number *(if known)* | 22-11020 |
|---|---|---|---|
| Date | July 28, 2022 | Date | |

B 104 (Official Form 104)           **For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims**        **Page 4**

Software Copyright (c) 1996-2022 Best Case, LLC    - www.bestcase.com        Best Case Bankruptcy