**Hearing Date:  November 2, 2022**
**Time:  11:00 a.m.**
**Opposition due: October 24, 2022**
**Time     4:00 p.m.**

Jantra Van Roy, Esq.
Nathan Schwed, Esq.
ZEICHNER ELLMAN & KRAUSE LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400
jvanroy@zeklaw.com
nschwed@zeklaw.com

Attorneys for Creditors
 *ASCP, LLC and Ascribe Associates III, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>LAWRENCE A. FIRST<br><br>               Debtor. | Chapter 11<br><br>Case No. 22-11020-mg |

# MOTION OF ASCP, LLC AND ASCRIBE ASSOCIATES III, LLC TO DISMISS AND MEMORANDUM OF LAW

ZEICHNER ELLMAN & KRAUSE LLP
Attorneys for *ASCP, LLC and Ascribe Associates III, LLC*
1211 Avenue of Americas, 40th Fl.
New York, New York 10036
Telephone: (212) 223-0400

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND .......................................................................................................... 4

POINT I

    CAUSE EXISTS FOR DISMISSAL OR CONVERSION ................................. 9

    A.    Standard Under 11 U.S.C. § 1112(b) ........................................................ 9

    B.    Cause Exists Under 11 U.S.C. § 1112(b)(4)(A) ........................................ 9

        1.    *Substantial and Continuing Loss to Estate* ...................................... 10

        2.    *No Reasonable Likelihood of Rehabilitation* ................................... 11

        3.    *Funding From Litigation Claims* ..................................................... 12

    C.    Lack of Good Faith .................................................................................. 12

        1.    *Chapter 11 Petition Filed To Avoid Collection Efforts of a Single Creditor* ........................................................................ 14

        2.    *Two-Party Dispute* .......................................................................... 15

POINT II

    APPOINTMENT OF A TRUSTEE OR EXAMINER WILL NOT BEST SERVE CREDITORS ............................................................................ 15

POINT III

    DISMISSAL BETTER SERVES THE INTERESTS OF CREDITORS ..................................................................................................... 16

    A.    Factors a Court May Consider ................................................................. 16

    B.    Dismissal, Rather than Conversion, is in the Best Interest of the Creditors ........................................................................................... 17

CONCLUSION ........................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,
    113 F.3d 1304 (2d Cir. 1997) ............................................................................ 13, 15

*Efron v. Candelario, (In re Efron)*,
    529 B.R. 396, 2015 Bankr. LEXIS 1390 (1st Cir. 2015) ....................................... 18

*In re 68 W. 127 St., L.L.C.*,
    285 B.R. 838 (Bankr. S.D.N.Y. 2002) ................................................................. 13

*In re 250 Pixley Rd., LLC*,
    2018 Bankr. LEXIS 765 (Bankr. W.D.N.Y. Mar. 16, 2018) ................................. 18

*In re Acme Cake Co.*,
    2010 Bankr. LEXIS 3689, 2010 WL 4103761
    (Bankr. E.D.N.Y. Oct. 18, 2010) ............................................................................. 17

*In re Ameribuild Const. Mgmt., Inc.*,
    399 B.R. 129 (Bankr. S.D.N.Y. 2009) ................................................................. 12

*In re BH S&B Holdings, L.L.C.*,
    439 B.R. 342 (Bankr. S.D.N.Y. 2010) ...................................................... 9, 11, 12

*In re eFusion Servs., LLC*,
    60 Bankr. Ct. Dec. (LRP) 42, 2014 Bankr. LEXIS 4412
    (Bankr. D. Colo. Oct. 16, 2014) ......................................................................... 18-19

*In re FRGR Managing Member LLC*,
    419 B.R. 576 (Bankr. S.D.N.Y. 2009) ................................................................. 12

*In re Greene*,
    57 B.R. 272 (Bankr. S.D.N.Y. 1986) ................................................................... 11

*In re HBA East, Inc.*,
    87 B.R. 248 (Bankr. E.D.N.Y. 1988) ............................................................. 13, 15

*In re Loco Realty Corp.*,
    2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009) ............................................. 13

*In re Mazzocone*,
    183 B.R. 402, 1995 Bankr. LEXIS 741 (Bankr. E.D. Pa. 1995),
    aff'd, 200 B.R. 568, 1996 U.S. Dist. LEXIS 13385 (E.D. Pa. 1996) ...................... 17

*In re Mense*,
509 B.R. 269, 59 Bankr. Ct. Dec. (LRP) 126, 2014 Bankr.LEXIS 1641
(Bankr. C.D. Cal. 2014) ........................................................................ 18

*In re Northwest Co., L.L.C.*,
2020 Bankr. LEXIS 3277 (Bankr. S.D.N.Y. Nov. 20, 2020) .................................. 11

*In re Sapphire Dev., L.L.C.*,
73 Collier Bankr. Cas. 2d (MB) 1776, 2015 Bankr. LEXIS 2100
(Bankr. D. Conn. June 26, 2015), *aff'd*, 549 B.R. 556,
2016 U.S. Dist. LEXIS 11179 (D. Conn. 2016) ...................................................... 18

*In re Schulz*,
436 B.R. 170 (Bankr. M.D. Fl. 2010) ............................................................ 14, 18

*In re Sillerman*,
605 B.R. 631 (Bankr. S.D.N.Y. 2019) .................................................................. 11

*In re Strawbridge*,
2010 Bankr. LEXIS 544 (Bankr. S.D.N.Y. Mar. 5, 2010)...................................... 13

*Loop Corp. v. U.S. Trustee*,
379 F.3d 511 (8th Cir. 2004) .................................................................................. 11

**Statutes**

11 U.S.C. § 1112(b) ............................................................................................. 1, 9, 11

**Rules**

Local Bankruptcy Rule 1007-2 .................................................................................. 10

Affiliated creditors ASCP, LLC ("ASCP") and Ascribe Associates III, LLC ("Ascribe") by their attorneys, Zeichner Ellman & Krause, LLP, submit this memorandum of law in support of their motion, pursuant to 11 U.S.C § 1112(b)(1), to dismiss this case, and for such other and further different relief as is just and proper. Section 1112(b)(1) requires dismissal or conversion of a case, whichever is in the best interests of creditors and the estate, if "cause" exists (unless appointment of a trustee or examiner is in the best interests of creditors).

## PRELIMINARY STATEMENT

This bankruptcy case did not arise as a result of business distress, nor is there any business to reorganize. Rather, Debtor Lawrence A. First ("First") simply received massive "carried interest" distributions from Ascribe and certain of its affiliates, which were all subject to clawback (and borrowed millions more from ASCP in order to pay certain of his clawback obligations) and opted to consume it to support an extravagant lifestyle, rendering himself insolvent, and then transferred over $8.5 million to his wife, Marie Iamunno ("Iamunno"), during the pendency of ASCP's lawsuit against him. First has been unemployed with no income since 2021 and has no projected disposable income with which to fund an individual plan.

First owes Ascribe and ASCP more than $16 million, consisting of approximately $11.2 million in clawback obligations relating to carried interest distributions remitted to First and an approximately $5 million judgment resulting from a loan to First to fund prior clawback obligations.

1

First sought the loan in 2019 because he was cash strapped as a result of, among other things, carrying a house in Scarsdale and a condo on the Upper West Side while he was gut renovating a townhouse on the Upper West Side that he purchased in 2017 for $13 million and spent between $10 and $15 million to renovate, all with the knowledge that his then contingent clawback obligations far exceeded his assets.[1] ASCP agreed to extend the loan based on First's promise to repay it upon the later of his sale of the Scarsdale house or June 1, 2021. First did not repay the loan after selling both his Scarsdale house and his condo. Instead, he sold the townhouse during the pendency of ASCP's action to recover on the loan, netting approximately $11.3 million, and directed that over $8.5 million of the sale proceeds be transferred to his wife, Marie Iamunno.[2]

Like many of his partners, First received an enormous amount of carried interest distributions (in excess of $43 million)[3] over the course of his 13 year tenure as Chief Investment Officer of certain Ascribe affiliates, all of which were subject to

---

[1] When First purchased the townhouse in May 2017, First had received distributions of $29,428,281 of cumulative carried interest from Ascribe II GP, Ascribe III GP and American Securities Associates VI, LLC for which First had an unliquidated contingent liability in the following amounts: (a) $13,595,515 from Ascribe II GP; (b) $14,511,182 from Ascribe III GP; and $1,321,584 of cumulative carried interest distributions from American Securities Associates VI, LLC. His contingent liability related to these carried interest distributions was the After Tax Amount related to these distributions (as defined in the applicable partnership documents) of approximately $22 million.

[2] First transferred most of the net proceeds to Iamunno despite the fact that all funds (other than mortgage loans) used to acquire, maintain and improve the Manhattan townhouse were provided by First and none were provided by Iamunno.

[3] First received $6,876,066 from American Securities Opportunities Associates, LLC, $14,447,996 from Ascribe Associates II, LLC, $20,212,238 from Ascribe Associates III, LLC, and $1,692,890 from American Securities Associates VI, LLC.

potential clawback claims. This is in addition to his substantial annual salary and bonuses during that 13 year span which aggregated $45.4 million. Unlike his partners, First did not set aside funds to be able to pay clawback claims,[4] choosing instead to live so lavishly that he is now in the red, having spent (or transferred to others) even those carried interest distributions that remained subject to clawback.[5]

Even now, despite claiming to have assets of only $2.5 million, a deeply negative net worth, and no income, First continues to live lavishly at the expense of the estate. At the §341 meeting, First testified that he was funding his monthly living expenses from "available liquidity." When pressed to explain the phrase "available liquidity," he admitted that it means the $2.5 million in the DIP account. He also testified that he needs two residences, a home in Weston, Connecticut (despite the fact that his offspring are self-supporting adult professionals who live elsewhere) and an apartment in the West Village that he, his wife and adult son rent at a monthly rate of $9,000. When asked about the need for the latter, First took exceptional umbrage, asking in response whether the question was "suggesting" that he may need only one residence.

Nothing in the Bankruptcy Code entitles a debtor to use estate assets to fund a lavish lifestyle. The fact that that he had become accustomed to spending money

---

[4] First funded the first of his two clawback obligations to Ascribe Associates II, LLC in the amount of $4,015,329 and then borrowed $6,019,914 from ASCP to fund the second. First failed to fund his clawback obligation to Ascribe Associates III, LLC in the amount of $11,204,331.

[5] ASCP does not concede First's assertion that the funds have been consumed, and reserves its rights to separately address discharge and fraudulent transfer issues.

owed to others to support his lifestyle does not justify continuing to do so while invoking the protections of Chapter 11.

## BACKGROUND

### First's Real Estate

First owned three properties: a house located at 20 Oxford Road, Scarsdale, New York (the "Scarsdale House"), an apartment located at 239 Central Park West, New York, New York (the "CPW Apartment"), and a townhouse located at 30 West 85th Street, New York, New York (the "Townhouse," together with the Scarsdale House and CPW Apartment, the "Real Estate"). First provided all of the funds (other than mortgage loans) used to acquire the Real Estate, made payments on all relevant mortgage loans from his funds and provided all funds to maintain and improve the Real Estate. Iamunno did not provide any funds to acquire, maintain and improve the Real Estate or to pay the mortgage loans.

First acquired the Scarsdale House in 1998 and sold it on May 15, 2020, netting sale proceeds of approximately $665,000.00.

First acquired the CPW Apartment in 2014 and sold it on January 28, 2019, netting sale proceeds of approximately $2.28 million.

First acquired the Townhouse on May 10, 2017 (the "Townhouse Purchase Date") for approximately $13 million, funded with approximately $8 million of his own funds and a $5 million mortgage loan. Over the period of several years after the

Townhouse Purchase Date, First used approximately $10 million of his own funds to pay for improvements to the Townhouse (the "Townhouse Improvement Transfers").

Or about January 22, 2022, during the pendency of ASCP's lawsuit that resulted in its Judgment (described below), First sold the Townhouse for $18.3 million netting sale proceeds (after satisfying his mortgage) of approximately $11.3 million (the "Townhouse Sale Proceeds"). Only $2,781,577.85 of the Townhouse Sale Proceeds was distributed to First, who has been using those proceeds to fund his lavish lifestyle. The remaining $8,555,704.80 of the Townhouse Sale Proceeds was distributed to Iamunno via a wire transfer to an account she maintained solely in her name (the "Townhouse Proceeds Transfer"). Iamunno has earned no income for decades and has had few assets other than the Real Estate First acquired for them to hold jointly. Iamunno did not provide reasonably equivalent value to First in exchange for her receipt of a joint interest in the Townhouse, the Townhouse Improvement Transfers or the Townhouse Proceeds Transfer.

**ASCP's Judgment Against First**

In 2019, while First owned all of the Real Estate, he owed a clawback obligation due June 10, 2019. To fund that clawback obligation, First requested a loan from ASCP because he was purportedly cash-strapped as a result of carrying the Scarsdale House and the CPW Apartment while gut renovating his Townhouse. ASCP lent First approximately $6 million, which became due and payable in June 2021. First refused to repay the loan when due, and ASCP sought summary judgment in lieu of

complaint (the "ASCP Action"). While that action was pending, First sold the Townhouse and caused over $8.5 million of the $11.3 million net proceeds to be distributed to his wife. The action resulted in a judgment against First, entered on March 30, 2022, in the sum of $4,726,830.29 (the "Judgment"). First did not appeal the Judgment.

**First's Clawback Obligations**

In 2008, First joined Ascribe Capital LLC ("Ascribe Capital") as a Managing Director and Chief Investment Officer. Ascribe Management LLC is the Advisor to Ascribe Opportunities Fund II, L.P., Ascribe Opportunities Fund II(B), L.P. and Ascribe II Alternative Investments, L.P. (together, "Ascribe II LP"). Ascribe Capital is the Advisor to Ascribe Opportunities Fund III, L.P., Ascribe Opportunities Fund III(B), L.P. and Ascribe III Alternative Investments, L.P. (together, "Ascribe III LP"). Ascribe Capital was formed in connection with formation of Ascribe III funds and also serves as the Advisor to the Ascribe IV funds.

First is a Professional Member of Ascribe Associates II LLC ("Ascribe II GP")[6] pursuant to the Amended and Restated Limited Liability Company Agreement of Ascribe Associates II, LLC, entered into as of March 29, 2013 (the "Ascribe II GP LLC Agreement"). Pursuant to the Ascribe II GP LLC Agreement, each of the members of

---

[6] Ascribe II GP is the sole General Partner of Ascribe Opportunities Fund II, L.P., Ascribe Opportunities Fund II(B), L.P. and Ascribe II Alternative Investments, L.P. (together, "Ascribe II LP") pursuant to the Amended and Restated Limited Partnership Agreements of American Securities Opportunities Fund II, L.P., American Securities Opportunities Fund II(B), L.P. and ASOF II Alternative Investments, L.P., (the "Ascribe II LP Partnership Agreements"). The American Securities Opportunity/ASOF funds changed their names to "Ascribe" funds on or about July 20, 2015.

Ascribe II GP agreed to refund certain amounts previously distributed to them under certain specified circumstances.[7]

Pursuant to Section 4.6(b) of the Ascribe II GP LLC Agreement, each carried interest distribution gave rise simultaneously to an unliquidated, contingent claim by Ascribe II GP against each of its members, including First. Each member of Ascribe II GP was aware of the existence of such claim at the time of each carried interest distribution.

As of the Townhouse Purchase Date, First had received $13,595,515 of cumulative carried interest distributions from Ascribe II GP for which he had an unliquidated, contingent liability in the After-Tax Amount related to these distributions (as defined in the applicable partnership documents).

Certain of First's clawback obligations became due and payable in early 2022. Ascribe commenced a proceeding under the auspices of the AAA seeking an award of approximately $11.2 million plus applicable interest and legal fees. The Debtor has not disputed the Ascribe claim that he owes approximately $11.2 million in clawback obligations. Instead, the Debtor has separately asserted a claim against certain affiliates of Ascribe. Those claims are primarily premised upon an alleged breach of an unsigned

---

[7] Pursuant to Section 9.4(a) of the Ascribe II LP Partnership Agreements, the General Partner may be obligated to return to the Partnership the lesser of the Interim Clawback Amount (as defined therein) and the After-Tax Amount of the aggregate distributions of Carried Interest to the General Partner with respect to such Limited Partner (as defined therein).

Separation Agreement, the same unsigned agreement that First placed at issue in the

ASCP Action, in which the Supreme Court, New York County ruled that:

> The unsigned separation agreement (see Dkt. 36 at 8) and June 30, 2021 "draft" of a "SUMMARY OF TERMS" (Dkt. 19) do not affect defendant's liability under the note…. Indeed, after defendant did not sign the separation agreement, there were subsequent negotiations over its terms (see Dkt. 38). Nor was there an agreement to extend the maturity date (see Dkt. 23 at 3 ["I already told you what I'm prepared to sign in term of a global deal — which is I'll pay the $5.0mm when I sell my house. You've said 'no'"]).

> Defendant's suggestion (see Dkt. 30 at 18 n 1) that the parties orally waived the note's signed-writing requirement and that his partial performance negates that requirement are unavailing because he does not explain how his partial performance is "unequivocally referable" to the alleged modification.  It is not. "In order to be unequivocally referable, conduct must be inconsistent with any other explanation. In other words, the actions alone must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement". For instance, defendant may have continued to work in furtherance of the parties' negotiations, and this possibility is enough to preclude a defense based on partial performance.

*ASCP, LLC v. Lawrence First*, Sup Ct, NY County, Mar. 4, 2022, Schecter, J., Index No.

656351/2021, NYSCEF Doc. No. 44 (internal citations omitted) attached to the Attorney

Declaration of Jantra Van Roy as Exhibit A.

# POINT I

## CAUSE EXISTS FOR DISMISSAL OR CONVERSION

### A.     Standard Under 11 U.S.C. § 1112(b)

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

"Subsection (b)(4) contains sixteen examples of events that may constitute cause. This list, however, is 'not exhaustive' and courts are free to consider other factors." *In re BH S&B Holdings, L.L.C.*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) (citation omitted).

### B.     Cause Exists Under 11 U.S.C. § 1112(b)(4)(A)

Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation constitute "cause" for dismissal or conversion. 11 U.S.C. § 1112(b)(4)(A). Where, as here, "[b]oth the Debtors' financial statements reflecting continuing losses and the Debtors' intention to liquidate establish that there is no likelihood of rehabilitation," cause has been established within the meaning of section 1112(b)(4). *BH S&B Holdings, supra*, 439 B.R. at 349.

1.    *Substantial and Continuing Loss to Estate*

The Debtor is unemployed and has no income. The only material assets listed in his schedules[8] are approximately $2.5 million in a DIP account and a claim (pending before the AAA) against certain affiliates of Ascribe[9] based upon alleged breaches of a purported separation agreement.

First asserts that he is spending approximately $13,000.00 monthly.[10] This includes approximately $6,600 in rental or lease obligations, approximately $2,000 in utilities, approximately $2,400 in medical expenses, and other miscellaneous living expenses. *Id.* However, First explains that his wife is contributing approximately the same amount toward their joint living expenses. First is playing a game of smoke and mirrors. First's wife has essentially no assets from which to "contribute" to their joint living expenses other than the $8.5 million of the $11.3 million Townhouse Sale Proceeds that First caused to be transferred to his wife several months prior to the bankruptcy filing, all of which is subject to fraudulent transfer avoidance. First's monthly expenses are, thus approximately $26,000, double the amount set forth in his schedules. In any event, the Debtor has and will continue to incur losses, as he has no income from which to fund any expenses.

---

[8]    *See* Summary of Assets and Liabilities, Official Form 106Sum (ECF No. 14).

[9]    *See* Arbitration Statement, Exhibit A to the Declaration of Lawrence A. First Pursuant to Local Bankruptcy Rule 1007-2 (ECF No. 7).

[10]    Summary of Assets and Liabilities, Official Form 106Sum (ECF No. 14).

2. *No Reasonable Likelihood of Rehabilitation*

In the context of 1112(b)(4)(A), "rehabilitation means to put back in good condition and reestablish on a sound basis." *BH S&B Holdings*, *supra*, 439 B.R. at 347.

Although chapter 11 permits liquidation plans, the word used in Section 1112(b)(4)(A), is not "reorganization" but "rehabilitation." "The word 'rehabilitation,' as used in Section 1112(b)(4)(A), does not include a liquidation." *In re Northwest Co., LLC*, 2020 Bankr. LEXIS 3277, at *8 (Bankr. S.D.N.Y. Nov. 20, 2020).

"Rehabilitation within the meaning of 11 U.S.C. § 1112(b)(1) has been defined to mean that the debtor would be reestablished on a firm, sound basis." *In re Greene*, 57 B.R. 272, 277 (Bankr. S.D.N.Y. 1986) (the debtors should not be permitted to remain in their home where the cost of doing so would exceed their take home pay, nor to speculate on a potential plan at the expense of their creditors); *see also BH S&B Holdings, supra*, 439 B.R. at 346 ("the Debtors' intention to liquidate (rather than rehabilitate) demonstrates that there is no likelihood of rehabilitation"), citing *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004); *In re Sillerman*, 605 B.R. 631, 656 (Bankr. S.D.N.Y. 2019) ("the absence of a reasonable likelihood of rehabilitation," may be satisfied if the movant demonstrates that the debtor will not have cash flow from which its current obligations can be met; court may find that the debtor's intention to liquidate constitutes an absence of a reasonable likelihood of rehabilitation"), citing *BH S&B Holdings*, *supra*, 439 B.R. at 346.

3. *Funding From Litigation Claims*

The Debtor's employment-related claim against ASCP affiliates does not overcome the 1112(b)(4)(A) showing:

> [C]ase law is clear that the mere hope of prevailing on potential litigation claims is not a sufficient basis to defeat a showing of cause to convert. *In re FRGR Managing Member L.L.C.*, 419 B.R. 576, 583 (Bankr. S.D.N.Y. 2009) ("[M]ost cases reject the need to evaluate the merits of a debtors litigation claims in deciding whether to dismiss or convert a chapter 11 case."); *see also In re Ameribuild Const. Mgmt., Inc.*, 399 B.R. 129, 134 (Bankr. S.D.N.Y. 2009).

*BH S&B Holdings*, *supra*, 439 B.R. at 350.

Even assuming arguendo that the potential value of the Debtor's claim in arbitration was relevant to his prospect of rehabilitation for purposes of this motion, for the reasons set forth in the decision in the ASCP Action, the Debtor's likelihood of success on that claim is near zero.

## C.    Lack of Good Faith

The petition should be dismissed because it was filed in bad faith.

> Courts consider multiple factors when determining whether a filing was made in bad faith, including whether "the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights" and the debtor's cash flow. *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997). Chief Judge Gonzalez recently opined that "the critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy." *In re Loco Realty Corp.*, 2009 WL 2883050, at *3 (quoting *In re 68 W. 127 St., L.L.C.*, 285 B.R. 838 (Bankr. S.D.N.Y. 2002)) (internal quotation marks omitted).

*In re Strawbridge*, No. 09-17208-MG, 2010 Bankr. LEXIS 544, at *9 (Bankr. S.D.N.Y. Mar. 5, 2010).

"A perceived need for the automatic stay, without more, cannot convert a bad faith filing to a good faith one." *In re HBA East, Inc.*, 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988).

First has admitted that the impetus for filing this case was ASCP's notification that it intended to file a fraudulent transfer action against his wife and present an Order to Show Cause for an attachment. Indeed, First filed his petition the morning after receiving that notification. This admission, combined with the facts that First has no income, transferred the majority of his assets to his wife within a few months of the petition date, knew he would be cash-flow negative during this case, prepaid approximately a year's rent on his Connecticut house (partly pre-petition and partly post-petition), has no assets other than the funds in his declining bank account and his

purported claim against Ascribe's affiliates, has no other material creditors and has no ability to rehabilitate, epitomizes the type of bad faith that warrants dismissal.

1.   *Chapter 11 Petition Filed To Avoid Collection Efforts of a Single Creditor*

The Debtor has acknowledged that ASCP is his only material creditor. As such, First's purpose in filing a chapter 11 petition was to prevent ASCP from enforcing its Judgment (as well as its anticipated judgment on its clawback claim pending before the AAA) by, inter alia, recovering the funds he fraudulently conveyed to his wife. Simply put, First seeks to move ASCP's fraudulent transfer action against his wife to this Court. Such admitted purpose is improper:

> Chapter 11 was never intended to be used as a fist in a two-party bout. The Chapter is entitled reorganization and not litigation.
>
> Further, in the Debtor's Disclosure Statement, he stated that the "Chapter 11 filing was precipitated by the execution and seizure of his bank account and motor vehicle by a creditor," and that the petition was filed after negotiations with the creditor failed. (Doc. 43, p. 7). The Disclosure Statement does not indicate that the Chapter 11 petition was filed in response to any other financial need. Under the circumstances, the Court finds that the petition was filed to avoid the collection efforts of a single creditor in what is essentially a two-party dispute.

*In re Schulz*, 436 B.R. 170, 178 (Bankr. M.D. Fl. 2010).

2. *Two-Party Dispute*

That the Debtor's financial condition is, in essence, a two-party dispute and the Debtor has no cash flow are indicative of a bad faith filing. <u>C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)</u>, 113 F.3d 1304, 1311(2d Cir. 1997).

> An important factor to consider in determining whether a Chapter 11 case was initiated in good faith is whether the reorganization effort essentially involves a two-party dispute which can be resolved in a non-bankruptcy forum.
>
> Chapter 11 was never intended to be used as a fist in a two-party bout. The Chapter is entitled reorganization and not litigation.

*In re HBA East, Inc.*, 87 B.R. at 260.

The Debtor's financial problems involve only his disputes with Ascribe pending before the AAA. ASCP and Ascribe's anticipated dispute with Iamunno concerning the avoidance of the Debtor's $8.5 million transfer to her is not the Debtor's dispute.

## POINT II

## APPOINTMENT OF A TRUSTEE OR EXAMINER
## WILL NOT BEST SERVE CREDITORS

The only material claims against the estate are ASCP's Judgment and Ascribe's $11.2 million clawback claim pending before the AAA.[11] The only known assets to be recovered are the potential value, if any, of Debtor's employment-related claim against

---

[11] The Debtor testified at the 341 meeting that the $28,563.96 IRS claim he scheduled is based on an error by his accountant and that he expects the correct claim amount, if any, to be insignificant.

affiliates of ASCP pending in the same AAA proceeding and the fraudulent transfer claim against the Debtor's wife. The Debtor is positioned to ably pursue the arbitration. There is no value, only expense, in the appointment of a Trustee or Examiner to pursue the Debtor's fraudulent transfer action against his wife. The appointment of a trustee or examiner will merely add layers of expense and prolong the Chapter 11 case, further depleting the limited sources of repayment to ASCP and Ascribe, the only material creditors.

## POINT III

## DISMISSAL BETTER SERVES THE INTERESTS OF CREDITORS

Once a party establishes "cause," a court must examine whether dismissal or conversion of a case under chapter 7 is in the best interests of the creditors and the estate. 7 Collier on Bankruptcy ¶ 1112.04[6]. Courts have looked to multiple factors to determine which action better serves the interests of creditors and the estate. It is within the Court's discretion to convert or dismiss a chapter 11 case, provided the best interests of the creditors and the estate are served. *In re Acme Cake Co.*, 2010 Bankr. LEXIS 3689, 2010 WL 4103761, at *2 (Bankr. E.D.N.Y. Oct. 18, 2010).

### A.   Factors a Court May Consider

Factors favoring conversion of Chapter 11 case to Chapter 7 over dismissal include: (1) debtor has substantial unencumbered assets capable of being administered by Chapter 7 trustee, (2) creditor consensus supports conversion, (3) dissipation of debtor's assets is possible, (4) debtor utilized Bankruptcy Court for his

benefit and equitable argument exists that creditor should now be allowed to do so, and

(5) debtor engaged in past unethical and fraudulent practices. *In re Mazzocone*, 183 B.R.

402, No. 93-12296DAS, 1995 Bankr. LEXIS 741 (Bankr. E.D. Pa. Jun. 2, 1995), *aff'd*,

200 B.R. 568, 1996 U.S. Dist. LEXIS 13385 (E.D. Pa. 1996).

**B.      Dismissal, Rather than Conversion, is in the Best Interest of the Creditors**

The Court should not convert a case where the case was filed to avoid the

collection efforts of a single creditor or the primary impact of conversion is to discharge

the debtor's primary obligation with little effect on other creditors:

> Accordingly, a conversion to Chapter 13 may have little
> effect on unsecured creditors, but may discharge the major
> portion of the debt to Justice. While this result might be of
> substantial benefit to the Debtor, it does not appear to be in
> the best interest of Justice. Viewing the creditor body as a
> whole, a conversion to Chapter 13 does not appear to be in
> the best interest of creditors.

*In re Schulz*, 436 B.R. 170, 179 (Bankr. M.D. Fl. 2010). *See also In re 250*

*Pixley Rd., L.L.C.*, 2018 Bankr. LEXIS 765 (Bankr. W.D.N.Y. Mar. 16, 2018) (because

there was only one unsecured creditor in debtor's Chapter 11 case, dismissal rather than

conversion was in best interests of creditors and the estate); *In re Sapphire Dev., L.L.C.*,

73 Collier Bankr. Cas. 2d (MB) 1776, 2015 Bankr. LEXIS 2100 (Bankr. D. Conn. June

26, 2015), *aff'd*, 549 B.R. 556, 2016 U.S. Dist. LEXIS 11179 (D. Conn. 2016)(dismissal

of Chapter 11 case was warranted because interests of creditors were not better served by

conversion than by dismissal and judgment creditor, largest unsecured creditor,

specifically requested dismissal so that he could pursue state court action that was stayed

by bad faith filing of Chapter 11 case); *Efron v. Candelario (In re Efron)*, 529 B.R. 396, 2015 Bankr. LEXIS 1390 (1st Cir. 2015) (it was within bankruptcy court's discretion to dismiss rather than convert debtor's Chapter 11 case to Chapter 7 because case was essentially two-party dispute between debtor's ex-wife and debtor over division of their marital property and it was unlikely that introduction of trustee would do anything but add additional party to two party dispute); *In re Mense*, 509 B.R. 269, 59 Bankr. Ct. Dec. (LRP) 126, 2014 Bankr. LEXIS 1641 (Bankr. C.D. Cal. 2014) (dismissal, rather than conversion, was in best interest of creditors where debtor corporation's and individual debtor's (ID) chapter 11 petitions were not filed in good faith as largest creditor, judgment creditor, favored dismissal, no creditor favored conversion, ID was solvent and economic value of respective estates would diminish if cases either remained in chapter 11 or were converted to chapter 7); *In re eFusion Servs., LLC*, 60 Bankr. Ct. Dec. (LRP) 42, 2014 Bankr. LEXIS 4412 (Bankr. D. Colo. Oct. 16, 2014) (dismissal of Chapter 11 debtor's case was more appropriate than conversion where there would be no benefit to estate or creditors from conversion to Chapter 7; rather, such action would merely substitute Chapter 7 trustee as one party in two-party dispute and force trustee to administer estate with no resources but with pending litigation).

## <u>CONCLUSION</u>

For the foregoing reasons, ASCP and Ascribe's motion to dismiss should be granted in its entirety

Dated:    October 4, 2022
          New York, New York

ZEICHNER ELLMAN & KRAUSE LLP

By: /s/ *Jantra Van Roy*
    Jantra Van Roy, Esq.
    Nathan Schwed, Esq.
    Attorneys for Creditors
      ASCP, LLC and
      Ascribe Associates III, LLC
    1211 Avenue of the Americas
    New York, New York 10036
    (212) 223-0400
    jvanroy@zeklaw.com
    nschwed@zeklaw.com

4872-5011-0005, v. 3