**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LAWRENCE A. FIRST,<br><br>Debtor. | **NOT FOR PUBLICATION**<br><br>Case No. 22-11020<br>Chapter 11 |

**MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS**
**CHAPTER 11 CASE**

*A P P E A R A N C E S:*

ZEICHNER ELLMAN & KRAUSE LLP
*Attorneys for Creditors ASCP, LLC and Ascribe Associates III, LLC*
1211 Avenue of the Americas
New York, New York 10036
By:   Jantra Van Roy, Esq.
   Nathan Schwed, Esq.

KIRBY AISNER & CURLEY LLP
*Attorneys for the Debtor and Debtor*
*in Possession*
700 White Plains Road, Suite 237
Scarsdale, New York 10583
By:   Erica Feynman Aisner, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the motion (the "Motion," ECF Doc. # 33) of affiliated creditors ASCP, LLC ("ASCP") and Ascribe Associates III, LLC ("Ascribe" and together with ASCP, the "Movants") for an order dismissing the Chapter 11 case of the debtor Lawrence A. First ("First" or the "Debtor") for cause or, in the alternative, to convert the case to a Chapter 7. The Motion is supported by the Movants' memorandum of law (the "Brief," ECF Doc. # 33-1), a declaration by Janta Van Roy, attorney for the Movants ("Roy Declaration," ECF Doc. # 33-2), which attaches a copy of the Decision and Order in the case of *ASCP, LLC v. Lawrence Debtor*,

Sup Ct, NY County, Mar. 4, 2022, Schecter, J., Index No. 656351/2021 [NYSCEF Doc. No. 44] (the "New York Judgment," ECF Doc. # 33-3). The Debtor filed an opposition to the Motion (the "Opposition," ECF Doc. # 46). The Opposition also incorporates by reference the Debtor's Local Bankruptcy Rule 1007-2 Declaration (ECF Doc. # 7, "First Decl.").

For the reasons set forth below, the Motion is **DENIED**.

## I.     BACKGROUND

### A.  The Chapter 11

On July 27, 2022, First filed a chapter 11 voluntary petition. (*See* ECF Doc. # 1.) The IRS has filed a $20,825 priority claim (Claim #1-2); AmEx has filed a $590 claim (Claim #2-1); the New York State Department of Taxation and Finance has filed a $451,333 priority claim and $61,207 non-priority claim (Claim #3-1); ASCP has filed a $4.8 million claim (Claim #4-1); and Ascribe has filed an $11.6 million claim (Claim #5-1). Further, First's Schedule E/F (ECF Doc. # 14) lists additional non-AmEx credit card obligations (Items 4.6 and 4.7), not marked C/U/D.

### B.  Debtor's Clawback Obligations

In 2008, Debtor joined Ascribe Capital LLC ("Ascribe Capital") as a Managing Director and Chief Investment Officer. Ascribe Management LLC is the Advisor to Ascribe Opportunities Fund II, L.P., Ascribe Opportunities Fund II(B), L.P. and Ascribe II Alternative Investments, L.P. (together, "Ascribe II LP"). (Brief at 10). Ascribe Capital is the Advisor to Ascribe Opportunities Fund III, L.P., Ascribe Opportunities Fund III(B), L.P. and Ascribe III Alternative Investments, L.P. (together, "Ascribe III LP"). (*Id.*) Ascribe Capital was formed in

2

connection with formation of Ascribe III funds and also serves as the Advisor to the Ascribe IV funds. (*Id.*).

Debtor is a Professional Member of Ascribe Associates II LLC ("Ascribe II GP") pursuant to the Amended and Restated Limited Liability Company Agreement of Ascribe Associates II, LLC, entered into as of March 29, 2013 (the "Ascribe II GP LLC Agreement"). (*Id.*) Pursuant to the Ascribe II GP LLC Agreement, each of the members of Ascribe II GP agreed to refund certain amounts previously distributed to them under certain specified circumstances. (*Id.*) Specifically, the parties agree that Debtor received "carried interest" distributions, that were subject to clawback under certain circumstances (Brief at 1; Opposition ¶ 7.)

In 2019, to satisfy a clawback obligation, Debtor executed an approximately $6 million promissory note in favor of ASCP ("2019 Note"). (Opposition ¶ 8.) As of June 2021, which was the maturity date, Debtor contends he had paid down the principal balance to around $4.7 million. (*Id.* ¶ 9.)

Around the same time, Movants' principal, Michael Fisch, caused certain of their companies and their affiliates to enter into a merger agreement with Birch Grove, which Debtor argues was in violation of his employment agreement. (*Id.* ¶ 10.) Debtor argues he was notified of the merger in June 2021 (after-the-fact), following which Debtor claims he negotiated a detailed separation agreement. (*Id.* ¶ 11.) Under his employment agreement Debtor contends that he would have been entitled to significant payments if terminated without cause. (*Id.*) Debtor argues that the separation agreement provided for *inter alia* settlement of the 2019 Note and other clawback obligations, reduction of Debtor's income and other compensation, go-forward title, responsibilities and monetary obligations and relinquishment of his financial

3

holdings in the various funds and waiver of monies that would otherwise have been due upon termination. (*Id.*) The Movants contend that the alleged separation agreement was never executed. (Brief at 7–8.)

On September 23, 2021 and November 9, 2021, clawback demands were issued to Debtor in relation to one of the funds (Fund IV). (Opposition ¶ 13.) The Debtor contends that these clawbacks were issued even though the separation agreement provided for relinquishment of his interests in that fund. (*Id.*) Movants, disagree, arguing again that the separation agreement was not executed. (Brief at 7–8.) In total, Movants claim that Debtor owes them approximately $16 million, $11.2 million in clawback obligations and $5 million dollars resulting from the New York Judgment. (*Id.* at 1.)

On November 19, 2021, Debtor was declared in default for failing to satisfy his clawback obligations, and eleven days later his employment was terminated. (Opposition ¶ 14).

**C. The New York Judgment**

On November 4, 2021, ASCP commenced a CPLR § 3213 action on the 2009 Note in New York County Supreme Court (the "New York Court"). (*Id.* ¶15.) Debtor contends that action was commenced while Debtor was still an employee of the Movants and acting as a director of four portfolio companies as required by the separation agreement. (*Id.*) The New York entered a Decision and Order granting the Movant's motion for a Judgment on March 4, 2022. (*Id.* ¶ 16). The New York Judgment was entered March 30, 2022. (*Id.*) Debtor did not appeal the New York Judgment. (Brief at 6.) The New York Court ruled that the 2019 Note was not modified by the separation agreement:

> The unsigned separation agreement (see Dkt. 36 at 8) and June 30, 2021 "draft" of a "SUMMARY OF TERMS"(Dkt. 19) do not affect defendant's liability under the note…. Indeed, after defendant did not sign the separation agreement, there were

4

> subsequent negotiations over its terms (see Dkt. 38). Nor was there an agreement to extend the maturity date (see Dkt. 23 at 3 ["I already told you what I'm prepared to sign in term of a global deal — which is I'll pay the $5.0mm when I sell my house. You've said 'no'"]).
>
> Defendant's suggestion (see Dkt. 30 at 18 n 1) that the parties orally waived the note's signed-writing requirement and that his partial performance negates that requirement are unavailing because he does not explain how his partial performance is "unequivocally referable" to the alleged modification. It is not. "In order to be unequivocally referable, conduct must be inconsistent with any other explanation. In other words, the actions alone must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement". For instance, defendant may have continued to work in furtherance of the parties' negotiations, and this possibility is enough to preclude a defense based on partial performance.

*ASCP, LLC v. Lawrence Debtor*, Sup Ct, NY County, Mar. 4, 2022, Schecter, J., Index No. 656351/2021, NYSCEF Doc. No. 44 (internal citations omitted) attached to the Attorney Declaration of Jantra Van Roy as Exhibit A.

The New York Court also left open the possibility that the Debtor could have potential additional claims regarding his employment based on other agreements:

> To the extent defendant has any claims against plaintiff or its related entities regarding his employment or other claims based on other agreements he is of course free to assert them in a separate action. For instance, plaintiff had the right (but not the obligation) under ¶ 3 to set-off the amount owed with distributions from other entities (Dkt. 4 at 2). Defendant's speculation that other distributions may have occurred is insufficient to defeat summary judgment. If he is owed distributions from other entities that can be addressed in a separate action. Defendant, however, has not actually proffered any valid defenses to his default under the note.

(*Id.*)

### D. The Arbitration

On June 10, 2022, an affiliate of Fund III (Ascribe) commenced an AAA arbitration

5

proceeding (the "Arbitration") seeking payment of the Fund III clawback. (Opposition ¶ 18.) Debtor claims that he engaged Mr. Fisch and the companies in an effort to settle. (*Id.* ¶ 19.) Debtor argues that ASCP pressed forward with collection efforts and has, *inter alia*, threatened to seek an *ex parte* attachment of his and his wife's assets, which he contends would leave them unable to defend themselves, prosecute affirmative claims in the Arbitration or pay basic living expenses. (Opposition ¶ 19 (citing First Decl. ¶¶ 22-25).). On July 25, 2022, two days before commencing this bankruptcy case, Debtor filed counterclaims in the Arbitration. (*Id.* ¶ 20.) This Court has approved the employment of general bankruptcy counsel and special litigation counsel, which counsel is handling the Arbitration. (*See* ECF Doc. ## 28–29.)

On September 15, 2022, this Court entered a stipulation and order lifting the automatic stay, to permit Ascribe to prosecute its clawback claims in arbitration. (*See* ECF Doc. # 25.) On November 11, 2022, the arbitrators entered a Procedural and Scheduling Order Following Preliminary Hearing (Order No. 1) fixing dates and deadlines in the arbitration. (Opposition ¶ 24.) Under the order, the answer deadline was November 15, 2022; the fact discovery cut-off is January 27, 2023; and the "Final Evidentiary Hearing Dates" are April 17, 18, 19 and 20, 2023. (*Id.*)

### E. Debtor's Pre-Petition Activities

Pre-petition, Debtor owned three properties: a house located at 20 Oxford Road, Scarsdale, New York (the "Scarsdale House"), an apartment located at 239 Central Park West, New York, NY (the "CPW Apartment"), and a townhouse located at 30 West 85th Street, New York, NY (the "Townhouse," together with the Scarsdale House and CPW Apartment, the "Real Estate"). (Brief at 4.) Debtor provided all of the funds (other than mortgage loans) used to acquire the Real Estate, made payments on all relevant mortgage loans from his funds and provided all

6

funds to maintain and improve the Real Estate. (*Id.*) Debtor acquired the Scarsdale House in 1998 and sold it on May 15, 2020, netting sale proceeds of approximately $665,000.00. (*Id.*) Debtor acquired the CPW Apartment in 2014 and sold it on January 28, 2019, netting sale proceeds of approximately $2.28 million. (*Id.)*

On or about January 22, 2022, during the pendency of ASCP's lawsuit that resulted in the New York Judgment, Debtor sold the Townhouse for $18.3 million netting sale proceeds (after satisfying his mortgage) of approximately $11.3 million (the "Townhouse Sale Proceeds"). (*Id.* at 5.) Movants contend that only $2,781,577.85 of the Townhouse Sale Proceeds were distributed to Debtor. (*Id.*) The Movants argue that the remaining $8,555,704.80 of the Townhouse Sale Proceeds was distributed to Debtor's wife Marie Iamunno ("Iamunno") via a wire transfer to an account she maintained solely in her name (the "Townhouse Proceeds Transfer"). (*Id.*) Movants contend that Iamunno has earned no income for decades and has had few assets other than the Real Estate that Debtor acquired for them to hold jointly. (*Id.*) Movants also contend that Iamunno did not provide reasonably equivalent value to Debtor in exchange for her receipt of a joint interest in the Townhouse, the Townhouse Improvement Transfers or the Townhouse Proceeds Transfer. (*Id.*) Debtor argues that he transferred the Townhouse Proceeds Transfer to his wife because she owned the Townhouse as tenants by the entirety. (Opposition ¶ 39.)

**F. Debtor's Post-Petition Activities**

Movants contend that Debtor says he has been spending approximately $13,000.00 monthly post-petition. (Brief at 10 (citing "Summary of Assets and Liabilities," (ECF Doc. # 14).) But they contend, without citation, that First's wife is contributing approximately the same amount toward their joint living expenses, meaning his monthly expenses are $26,000, which is

7

not reflected in First's Monthly Operating Reports. (Brief at 10.) They argue that First's wife has essentially no assets from which to "contribute" to their joint living expenses other than the $8.5 million of the $11.3 million Townhouse Sale Proceeds, and that she is using these Townhouse Sale Proceeds that First caused to be transferred to his wife several months prior to the bankruptcy filing, all of which is subject to fraudulent transfer avoidance, to fund his living expenses. (*Id.*) Debtor argues that the Monthly Operating Reports make clear Mr. First has been partially supported by his wife during this case, in that they reflect no meaningful economic activity aside from reduction in the cash balance of his bank accounts since the petition date by about $40,000 (from $2,507,193 to $2,467,303). (*See* Opposition ¶ 39; Chapter 11 Monthly Operating Report for Month Ending 10/31/2022 (ECF Doc. # 41).).

## II. LEGAL STANDARD

### A. Cause for Conversion or Dismissal

Under section 1112(b) of the Bankruptcy Code, a court can dismiss a chapter 11 case or convert it to a case under chapter 7 "for cause" so long as it is in the best interests of both the creditors and the estate. 11 U.S.C. § 1112(b); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1112.04 (16th ed. 2022). Subsection (b)(4) contains sixteen examples of events that may constitute cause. This list is "not exhaustive," but an example pertinent to this case is: "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A); *see also In re Ameribuild Const. Mgmt., Inc.*, 399 B.R. 129, 131 n. 3 (Bankr. S.D.N.Y. 2009) (citing legislative history). The moving party has the burden of demonstrating cause for dismissal or conversion. *In re Loco Realty Corp.*, No. 09–11785(AJG), 2009 WL 2883050, at *2 (Bankr. S.D.N.Y. June 25, 2009). Movants under section

8

1112(b) bear the burden of establishing cause by a preponderance of the evidence. *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161, 170 (Bankr. S.D.N.Y. 2004).

### B. Diminution of Estate and Absence of Likelihood of Rehabilitation: Section 1112(b)(4)(A)

Under section 1112(b)(4)(A), cause for conversion or dismissal is established if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *In re Adamo*, No: 14-73640-LAS, 2016 WL 859349, at *4 (Bankr. S.D.N.Y. Mar. 4, 2016). "In determining whether a substantial or continuing loss to, or diminution of, the estate exists, a court must make a full evaluation of the present condition of the estate, not merely look at the Debtor's financial statements." *Id.* at *11 (quoting *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003)) (internal quotation marks omitted). Nevertheless, "the existence of a continuing loss to or diminution of the estate can be found where a Debtor consistently suffers a post-petition negative cash flow and is unable to pay current expenses." *Adamo*, 2016 WL 859349, at *11. Further, "rehabilitation means to put back in good condition and reestablish on a sound basis," and "implies establishing a cash flow from which its current obligations can be met." *AdBrite*, 290 B.R. at 216.

### C. Bad Faith

The relevant inquiry on a motion to dismiss on bad faith grounds is "whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy." *In re C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1309–10 (2d Cir. 1997) (quoting *Matter of Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991)). Courts consider multiple factors when determining whether a filing was made in bad faith, including whether "the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's

secured creditors to enforce their rights" and the debtor's cash flow. *See In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997).

### III. ANALYSIS

The Movants have not established cause for dismissal or conversion. While Movants have shown there will likely be a continuing loss, they have not shown that Debtor lacks a substantial likelihood of rehabilitation. Movants have also not established that the bankruptcy filing was made in bad faith. What is clear to the Court is that the Debtor's ability to successfully propose and confirm a chapter 11 plan hinges on the outcome of the Arbitration that all counsel agree is on track to be heard by a AAA three-arbitrator panel in the middle of April 2023. The Movants may prevail in that arbitration and the result may make it very unlikely that Debtor can propose and confirm a plan. But, at this point, the Debtor is entitled to an opportunity to have the claims and counterclaims in that arbitration adjudicated before dismissal or conversion of this case is appropriate.

#### A. Diminution of Estate

Movants argue there is a substantial and continuing loss due to First's monthly spending. (Brief at 10.) They also argue he will necessarily continue to have monthly losses, since he has no income, other than his wife assets, which they claim are recoverable as a fraudulent transfer, to fund his expenses. (*Id.*) In response, Debtor notes that he has obtained employment as a substitute teacher "that will afford [Debtor] regular assignments which he intends to accept while he continues to look for a more lucrative position." (Opposition ¶ 31 n.3.) Debtor's counsel estimated during the December 14, 2022 hearing that Debtor's income as a substitute teacher may be in the range of $2,500 and $3,000 per month. Debtor also has funds on hand of approximately $2.5 million. (Opposition ¶ 39.) He and his wife have also taken steps to

10

significantly reduce their monthly expenditures as this case proceeds and the April arbitration approaches. Of note, Debtor's counsel indicated that the Debtor and his wife will soon have no more rental expenses, which will save the estate at least approximately $6,600 dollars per month. (*See* Brief at 10 (citing Summary of Assets and Liabilities (noting that the Debtor has approximately $6,600 in monthly rental expenses)).). Given that the estate's loss over the course of the four-month case is approximately $40,000 total, this savings is considerable. (*See* Monthly Operating Report; Reporting Period Ending 10/31/2022 (ECF Doc. # 41.).) While the Debtor may continue to experience monthly losses in the early part of 2023, despite reducing his expenses and increasing his income, continuing losses may be tolerated if there is a reasonable likelihood of rehabilitation. *See In re Adamo*, No. 14-bk-73640, 2016 WL 859349, at *11 (Bankr. E.D.N.Y. Mar. 4, 2016) (citing 7 COLLIER ON BANKRUPTCY 1112.04[6] (16th ed. rev.)).

### B.     Likelihood of Rehabilitation

Movants have not met their burden to show that there is not a reasonable likelihood of rehabilitation. At the early stages of the case, to prove an absence of a reasonable likelihood of rehabilitation, the movant must show that there is no more than a 'hopeless and unrealistic prospect' of rehabilitation." *AdBrite*, 290 B.R. at 215 (quoting *In re Economy Cab & Tool Co., Inc.*, 44 B.R. 721, 724 (Bankr. D. Minn. 1984)). Movants have not done so here. This case was filed just four months ago; and as noted above, Mr. First has attested that if he prevails in the arbitration, he will be able to pay back all creditors in full. (First Decl. ¶ 30). Even if he is not successful in the arbitration, Mr. First contends that he has cash on hand to initially fund a Chapter 11 plan which would also include third party funds and future income. (Opposition ¶ 31.)

11

Accordingly, there appears to be some realistic prospect of rehabilitation here. *AdBrite*, 290 B.R. at 215.

Movants rely on this Court's decision in *In re FRGR Managing Member LLC*, 419 B.R. 576 (Bankr. S.D.N.Y. 2009) for the proposition that the mere hope of prevailing on potential litigation claims is not a sufficient basis to defeat a showing of cause to convert. (Brief ¶ 12.) ¶ But *FRGR* is inapposite. At the outset, *FRGR* does not, as Movants seem to argue, stand for the absurd proposition that where a creditor and debtor are engaged in litigation, and the debtor's ability to propose a plan hinges in large part on success in that litigation, that the creditor has grounds to dismiss the bankruptcy case. The motion in *FRGR* was brought by the U.S. Trustee, and not, as is the case here, by the defendant in the litigation at issue, and the Court's analysis was informed by that fact. *FRGR*, 419 B.R. at 578. In *FRGR*, the Court concluded that where the debtor had no other ability to fund a plan other than winning its litigation, and litigation "claims that would be used to fund the plan were complex and the litigation would be 'long and hotly contested,'" that there was no reasonable likelihood of rehabilitation. *Id.* at 584 (citation omitted). Here, in contrast, Debtor has at least some outside funds, including $2.5 million in cash, and assets from his wife, with which to fund a plan. (Opposition ¶ 31.) Additionally, a resolution of these claims is not far off, as an arbitration hearing is scheduled for April of this year. Further, as Debtor points out, the Arbitration is simply a means for litigating a disputed clawback claim, consistent with the parties' agreements to arbitrate quoted in ¶ 21 of the statement of claim attached to the First Declaration. Liquidating Mr. First's affirmative claims which would have the net effect of reducing the amount of money necessary to fund a Chapter 11 plan. (*Id.* ¶ 33.)

12

Finally, while the Court need not consider the merits of Debtor's litigation claim in order to find that there is a reasonable likelihood of rehabilitation, Movant's contention that Debtor has little or no chance of success on his arbitration claims seems farfetched. *See FRGR*, 419 B.R. at 582 (collecting cases where Courts determine whether rehabilitation was feasible "without fully probing the merits of the underlying litigation claims."). While the Movants contend that Debtor has no chance of prevailing in the Arbitration given the New York Judgment, the state court did not address the claims being asserted in arbitration related to Debtor's employment and severance agreement and no evidence has been submitted as to any merger clause governing the claims asserted in arbitration. (Opposition ¶ 32.) Thus, while this Court cannot without more information opine on any party's likelihood of success in the litigation, it is simply not the case that as a matter of law the New York Judgment indicates that Movants will prevail in the Arbitration.

### C. Bad Faith

The Movants make two principal arguments that Debtor filed this case in bad faith. Both fail. Movants argue that there is evidence of bath faith because 1) this a really a two-party dispute that is inappropriate for a chapter 11 and 2) the action was filed to prevent the collection of a single creditor.

As to the first argument, this is not a two-party dispute: the judgment creditor is ASCP, the Fund III clawback claim is asserted by Ascribe, Mr. First's arbitration claims are against the three other Companies that employed him, claims have been filed by the IRS ($20,825 priority), the NYS Department of Taxation and Finance ($451,333 priority; $61,207 non-priority)[5] and AmEx ($590), and there are still other creditors with claims not marked C/U/D listed in Schedule E/F. (Opposition at 11). Although Debtor does concede that ASCP and Fund III,

controlled by the same principal, do represent the majority of the creditor body, Judge Gropper noted in *In re Sletteland,* 260 B.R. 657, 667 (Bankr. S.D.N.Y. 2001), that "especially where the debtor is an individual a creditor's claim that it wholly controls the debtor's 'financial destiny' may weigh in favor of giving the individual access to a court of equity rather than against it."

As to the second argument, Debtor has shown that the dispute cannot be fully resolved in a non-bankruptcy forum. While ASCP's judgment can be paid in full under a plan, he cannot defend the clawback claims asserted in arbitration, and respond to the New York State tax audit, if his and his wife's assets were attached. (Opposition ¶ 45). This case plainly was not filed as a litigation tactic, Mr. First having stipulated to lift the automatic stay to permit the parties to litigate the issue of clawback claim allowance in the Arbitration. Accordingly, there is no evidence that this case was filed in bad faith.

### IV.    CONCLUSION

For the reasons explained above, the Motion to dismiss or convert this case is **DENIED.**[1]

**IT IS SO ORDERED.**

Dated:    December 15, 2022
         New York, New York

                                    *Martin Glenn*
                              _____
                                    MARTIN GLENN
                              United States Bankruptcy Judge

---

[1] The Debtor also filed a separate motion to extend exclusivity. (*See* ECF Doc. # 42.) At the conclusion of the December 14, 2022 hearing, the Court stated that it was going to file an opinion denying the motion to dismiss or convert, and also to grant the Debtor's motion to extend exclusivity at least until the April Arbitration is completed. The outcome of that Arbitration is likely to determine whether the Debtor has any reasonable likelihood of rehabilitation.

14